# IN THE SUPREME COURT OF IOWA

No. 19–1954

Submitted March 24, 2021—Filed June 30, 2021
Amended September 14, 2021

**CHRISTOPHER J. GODFREY,**

Appellee,

vs.

**STATE OF IOWA, TERRY BRANSTAD,** Governor of the State of Iowa, in His Official Capacity, **BRENNA FINDLEY,** Legal Counsel to the Governor of the State of Iowa, in Her Official Capacity,

Appellants.

---

Appeal from the Iowa District Court for Jasper County, Brad McCall, Judge.

Defendants appeal from judgment in favor of plaintiff on his claims for sexual-orientation discrimination and retaliation arising under the Iowa Civil Rights Act and violations of his due process rights under the Iowa Constitution. **REVERSED AND REMANDED.**

McDonald, J., delivered the opinion of the court, in which Waterman, Mansfield, and Oxley, JJ., joined. Appel, J., filed an opinion concurring in part and dissenting in part. McDermott, J., filed an opinion concurring in part and dissenting in part, in which Christensen, C.J., joined.

Debra Hulett (argued), Frank Harty, Katie Graham, and David Bower of Nyemaster Goode, P.C., Des Moines, for appellants.

Roxanne Conlin (argued), Devin Kelly, and Jean Mauss of Roxanne Conlin & Associates, P.C., Des Moines, for appellee.

**McDONALD, Justice.**

In November 2010, Republican Terry Branstad defeated incumbent Democratic Governor Chet Culver. While transitioning into office, Governor-elect Branstad sent a form letter to thirty executive branch officers appointed by prior Democratic administrations and requested each submit a letter of resignation. Iowa Workers' Compensation Commissioner Christopher Godfrey received the form letter and refused to resign. After Godfrey refused to resign, the Governor reduced Godfrey's compensation within a range fixed by statute.

Godfrey, who is gay, sued the State, the Governor, the Lieutenant Governor, members of the Governor's staff, and other state employees for, among other things, sexual-orientation discrimination and retaliation under the Iowa Civil Rights Act (ICRA), Iowa Code §§ 216.1–.21 (2011), and violations of Godfrey's constitutional right to be paid a particular salary. A jury found in favor of Godfrey. On appeal, the defendants claim they are entitled to judgment as a matter of law. In the alternative, the defendants contend they are entitled to a new trial because the district court committed numerous procedural, evidentiary, and instructional errors. We need not address the procedural, evidentiary, and instructional errors because we conclude the defendants were entitled to judgment as a matter of law with respect to all claims notwithstanding any errors.

I.

Terry Branstad was first elected Governor of Iowa in 1982. The citizens of Iowa reelected him in 1986, 1990, and 1994. Governor Branstad did not seek reelection in 1998 and decided to retire from public life. He obtained a position in the private sector as President of Des Moines University, an osteopathic school of medicine. At the time he was hired,

Branstad committed to the trustees of the university that he would stay out of and away from politics while serving in the position.

In January 1999, Governor Branstad was succeeded in office by Democratic Governor Thomas Vilsack. In 2005, Governor Vilsack's chief of staff communicated with relevant stakeholders to find candidates for the position of workers' compensation commissioner. The chief of staff forwarded three names to Governor Vilsack, including Godfrey, who was advanced and promoted by the Iowa Trial Lawyers Association, an association of lawyers who primarily represent plaintiffs or claimants. In forwarding Godfrey's name to the Governor, the chief of staff noted "the current commissioner is concerned about [Godfrey's] ability to be confirmed." Despite the reservations, Governor Vilsack nominated Godfrey to serve as the workers' compensation commissioner. Governor Vilsack knew Godfrey was gay and thought the nomination was important to reflect the diversity in the state.

Governor Vilsack testified the Iowa Association of Business and Industry (ABI) was opposed to Godfrey's appointment because of Godfrey's lack of administrative experience within the agency and because of its concern that Godfrey lacked an employer's perspective. ABI has more than 1000 business members and advocates for positions it believes will improve the business climate in Iowa and encourage employers to expand in or move to Iowa. ABI is a "very powerful organization" and regularly communicates its position on individuals and policies to elected officials. Governor Vilsack testified he listened to "groups like ABI and consider[ed] their concerns." After the administration provided more information to ABI regarding Godfrey's experience, ABI moved from opposed to neutral with respect to Godfrey's nomination.

In April 2006, Governor Vilsack withdrew Godfrey's nomination when it became apparent Godfrey would not obtain the necessary number of votes in the Iowa Senate needed for confirmation. Governor Vilsack then appointed Godfrey to serve as interim commissioner for the remainder of Godfrey's predecessor's term.

After being reelected once, Governor Vilsack decided not to run for reelection. His second term expired in January 2007, and he was succeeded in office by Governor Culver. As Governor Vilsack's second term was winding down, he asked all executive branch officers he appointed, including those appointed to a term of years, to submit letters of resignation so Governor Culver could make his own choices. Governor Vilsack thought "the new governor could decide for himself who should be [w]orkers' [c]ompensation commissioner." Governor Vilsack sent a letter to Godfrey requesting Godfrey submit a letter of resignation to the incoming administration for the purpose of "facilitating a smooth transition to a new administration." The chair of Governor-elect Culver's transition team sent a similar letter to Godfrey. Godfrey complied with Governor Vilsack's and Governor-elect Culver's requests and submitted his letter of resignation.

In January 2007, Governor Culver nominated Godfrey for the position of workers' compensation commissioner. In April, the senate confirmed the appointment for the remainder of the prior commissioner's term. In February 2009, Governor Culver nominated Godfrey for a new term as workers' compensation commissioner. The Iowa Senate unanimously confirmed the appointment. During the confirmation process in 2009, Democratic Senator Tom Courtney ran into newly elected Senator (now Governor) Kim Reynolds in the capitol lobby lounge and introduced Godfrey and his partner to Reynolds. Pursuant to statute,

Godfrey's term was six years, commencing May 1, 2009, and ending April 30, 2015. *See* Iowa Code § 69.19 (2009); *id.* § 86.1.

At trial, many witnesses testified that Godfrey was openly gay and that it was common knowledge Godfrey was openly gay. Governor Vilsack, Democratic Senator Mike Gronstal, Democratic Senator Courtney, and Democratic Senator Matt McCoy, among others, testified Godfrey's sexual orientation was common knowledge among legislators. Many of the deputy workers' compensation commissioners and commission staff testified it was common knowledge within the workers' compensation commission that Godfrey was gay.

Starting in the fall of 2009, a number of people approached Branstad and asked him to run for governor again. Branstad decided he would again seek the governorship. He hired Jeff Boeyink to serve as his campaign manager. During the campaign, Branstad met with thousands of business owners across the state and a "couple of themes emerged." First, was the need for property tax relief. Second, Branstad heard repeated complaints regarding workers' compensation and the workers' compensation commissioner. Branstad heard the commissioner, "in the way he conducted his office, was anti-employer, was biased against employers, and that was hurting the ability of some of these businesses to compete." Branstad heard similar complaints from ABI, the Iowa Motor Truck Association, self-insured companies, lawyers representing self-insured companies, BPI (a large meat processor), and other businesses.

Another issue that arose during the campaign was same-sex marriage. In 1998, the legislature passed the Defense of Marriage Act (DOMA). The act provided that "[o]nly a marriage between a male and a female is valid." 1998 Iowa Acts ch. 1099, § 1 (codified at Iowa Code § 595.2 (1999)). The bill was passed by the Iowa Senate by a vote of 40–9.

Democratic Minority Leader Gronstal and then-Senator Vilsack voted in favor of DOMA.  In April 2009, in the case of *Varnum v. Brien*, this court held that "the language in Iowa Code section 595.2 limiting civil marriage to a man and a woman [is unconstitutional and] must be stricken from the statute."  763 N.W.2d 862, 907 (Iowa 2009).  At the time of the *Varnum* decision, Governor Culver issued a press release stating he "personally believe[d] that marriage is between a man and a woman."  However, he was "reluctant" to support an amendment to the Iowa Constitution that would define marriage as between one man and one woman and effectively overrule *Varnum*.  Branstad and Republican Brenna Findley n/k/a Bird, who was running for the office of attorney general, were, at that time, in favor of overturning *Varnum* with a constitutional amendment or at least in favor of allowing Iowans the opportunity to vote on a proposed amendment.

Branstad defeated Governor Culver in the 2010 election.  In the days following the election, Governor-elect Branstad announced Boeyink would serve as his chief of staff and Bird would serve as his legal counsel.  Like Governors Vilsack and Culver, Governor-elect Branstad sought the resignation of appointed executive branch officers.  Boeyink and the transition team created a list of these officers, including those who served at the pleasure of the governor and those appointed for fixed terms.  On December 3, 2010, Boeyink sent form letters under the Governor-elect's signature to thirty officers, including seven officers appointed to a fixed term of years, asking for letters of resignation.  Godfrey was one of the thirty who received a resignation request.  Although the form letter was sent to twenty-nine other executive branch officers, Godfrey testified he believed this letter was sent to him because he was gay.

Twenty-seven of the thirty officers who received the resignation-request letters submitted their respective resignation letters. Three officers sent letters declining to submit a letter of resignation: Godfrey; David Neil, Labor Commissioner; and Steve Larson, Administrator of the Iowa Alcoholic Beverages Division (ABD).

After receiving letters from Godfrey, Neil, and Larson, the Governor-elect met with Boeyink to discuss options. Boeyink presented the Governor-elect with several options: accept the refusals and do nothing further; meet with these individuals, reiterate the resignation request and discuss the issue further; and publicly raise the issue and be more aggressive in seeking the resignations.

The Governor-elect decided to meet with the three individuals. The meetings were scheduled consecutively for thirty minutes each on December 29. Governor-elect Branstad, then-Lieutenant Governor-elect Reynolds, and Boeyink attended the meetings. In his meeting with the Governor-elect, Neil stated he was a "short-termer" because his term expired in a few months. He requested to stay on and smooth the transition to the person the Governor-elect wanted to appoint, Michael Mauro. The Governor-elect agreed. In his meeting with the Governor-elect, Larson explained that he had cleaned up the ABD and that it was functioning well. Larson asked the Governor's Office to confirm the information with Auditor of State David Vaudt.

In his meeting with the Governor-elect, Godfrey expressed his belief that he was entitled to serve the remainder of his term. Godfrey discussed why he should be allowed to serve in the position based on his past job performance. On the day of the meeting, Mike Ralston, President of ABI, forwarded to Boeyink an email from John Gilliland, Senior Vice President of Government Relations at ABI. The email identified four issues ABI had

with Commissioner Godfrey.  Governor-elect Branstad raised these points during the meeting with Godfrey, and Godfrey responded to each.  Godfrey testified the meeting was very cordial, productive, and went really well.  When Godfrey returned to his office, he thought everything would be fine and wrote thank you notes.  Godfrey's sexual orientation did not come up during this meeting.  This meeting was the first and only time Governor Branstad met Godfrey.

Like Governors Vilsack and Culver, Governor Branstad's personal beliefs regarding same-sex marriage had no apparent bearing on his appointment of and employment of gay individuals.  In February 2011, less than two months after meeting with Godfrey, Branstad appointed Doug Hoelscher, an openly gay man, to serve as the Director of the State–Federal Relations Office.  Branstad spent considerable time with Hoelscher, attended conferences with Hoelscher, and attended social events with Hoelscher and his long-time partner.

Between 2003 and 2007, Steve Churchill, who is openly gay, served with Branstad as the Vice President of Development and Alumni Relations at Des Moines University.  In 2017, Branstad resigned his position as Governor and began serving as Ambassador to the People's Republic of China.  Branstad was allowed only to bring one employee with him to China—a chief of staff.  Branstad hired Churchill for the position and testified Churchill is the person he relies on most.  Churchill described his working relationship with Governor Branstad:

> I've known him 37 years, worked for him five times.  I've seen him in public and in private.  I've never heard him say anything derogatory or insensitive or in any way demeaning to anyone based on their sexual orientation or really any protected class of individuals.  He's a very thoughtful, caring individual.  If he had done that, I would not be here today.  I would not work for him.  I would not work for someone who I think is intolerant.

Churchill testified he would never work for someone who discriminated against others, concluding, "I'm too old, I'm too gray, and I'm too gay to tolerate anyone who is intolerant. I wouldn't do it. It just doesn't make any sense."

After the December 29, 2010, meeting, the Governor's Office did not discuss the issue of resignations any further and turned its attention to other matters, including drafting speeches, filling other positions, and preparing for the legislative session. The Great Financial Crisis left the state's budget in bad shape, spurring an unusually busy and long legislative session that ran until June 30, 2011. The Governor's Office had no contact with Godfrey during this time period regarding his position. However, Boeyink received communications from ABI leadership that workers' compensation benefits in Iowa were too generous and making Iowa uncompetitive. ABI explained multistate employers identified the costs of workers' compensation in Iowa compared to other states as a significant factor when making business decisions.

As the legislative session was winding down, Governor Branstad returned to the issue of Larson's and Godfrey's refusals to resign. In late June, the Governor held a meeting with Boeyink and Bird. This was Bird's first involvement with the issue. Bird took no part in the decision to send the resignation requests or the December 29 meetings because she was still transitioning into her role as legal counsel. In the June meeting, the Governor told Boeyink and Bird he no longer sought the resignation of Larson; Auditor Vaudt confirmed Larson had made significant improvements in the finances of ABD. The Governor requested Boeyink inform Larson. The Governor decided he still sought Godfrey's resignation. The Governor requested Bird review some workers' compensation cases and prepare legal options with respect to Godfrey's position.

Governor Branstad, Boeyink, and Bird reconvened on July 5. Bird made an oral presentation regarding several workers' compensation decisions issued while Godfrey was serving as commissioner. Her summation of the cases "validated the governor's previously held belief about Mr. Godfrey's anti-employer bias." Bird reviewed the statutory grounds authorizing removal from office under Iowa Code section 66.26 (2011), which provides the executive council of the state can remove an appointed officer upon a majority vote for specific causes. Bird also reviewed the statute allowing the Governor to set the commissioner's salary. *See* 2008 Iowa Acts ch. 1191, §§ 13–14. Section 14 of the statute provided a salary range for the workers' compensation commissioner between $73,250 and $112,070. *See id.* § 14. At the time, Godfrey was being paid at the top of the statutory salary range.

Governor Branstad was the sole decision-maker regarding the commissioner's position and salary, and Branstad made two decisions relevant to this case. First, the Governor concluded there was no statutory basis to remove Godfrey from office. Second, based on the complaints he had received from his constituents regarding Godfrey's performance, the Governor decided the commissioner did not deserve to be paid at the top of the salary range and lowered the commissioner's salary to the lowest amount within the statutory range. Governor Branstad directed Boeyink to set up a meeting with Godfrey to again request his resignation. If Godfrey did not resign, the Governor directed Boeyink to communicate that the Governor had decided to lower the commissioner's salary.

Boeyink's assistant emailed Godfrey on July 6 and scheduled a meeting for July 11. In preparation for the meeting, Bird performed electronic research regarding Godfrey's appointment. She wanted to confirm the dates of appointment and duration of Godfrey's term. On

July 8, Bird came across a blog post that indicated Godfrey was gay. Bird testified the post did not appear particularly reliable. She decided not to tell the Governor because it was not relevant to the Governor's decision, but she did present the information to Boeyink. Boeyink agreed the information was not relevant because the Governor had already made the decision. Boeyink chose not to inform the Governor.

On the morning of July 11, Boeyink and Bird met with Godfrey. This was only the second time Boeyink met Godfrey and was the first and only time Bird met Godfrey. Prior to the meeting, ABI Senior Vice President Gilliland sent Boeyink an email regarding Iowa's workers' compensation premiums. Boeyink could not recall if he read the email prior to the meeting, during the meeting, or after the meeting. At the meeting, the parties exchanged pleasantries. Boeyink informed Godfrey the Governor again requested Godfrey's resignation, and Godfrey refused. Boeyink then informed Godfrey the Governor had decided to reduce Godfrey's salary to the lowest amount within the statutory range effective immediately. The meeting lasted only a few minutes. Godfrey's sexual orientation was not mentioned during the meeting.

Godfrey quickly spread the news of his salary reduction. He tried to contact the attorney general to see if the Division of Criminal Investigation would intervene and launch an investigation of Governor Branstad for blackmail or extortion. Godfrey also contacted multiple legislators the same day to see if they would intervene. After the meeting with Godfrey, Boeyink received a phone call from Senator William Dotzler. Dotzler told Boeyink that "you guys might want to consider the action you're taking on Chris Godfrey. He is an openly gay man, and that can be an issue coming

down the road." Boeyink told Senator Dotzler, "I appreciate that. I don't think I can talk about this. I thank you for the call."[1]

Godfrey and people acting on his behalf worked with others to leak the story of his salary reduction to the press on July 11. The day after Godfrey leaked the story to the press, Governor Branstad conducted a radio interview. In response to a caller's question regarding Godfrey, the Governor stated he believed the governor should have the ability to choose his own team to help the state attract more business and jobs and make the state more competitive. He also stated he, as governor, should be the one to choose the workers' compensation commissioner. With respect to satisfaction with the current commissioner, the Governor said, "Talk to the Iowa Association of Business and Industry. They are the ones that encouraged me to make a change there."

The following day, Godfrey made a public accusation that the defendants had discriminated against him on the basis of his sexual orientation. Branstad testified this was the first time he heard Godfrey was gay.

In January 2012, Godfrey sued the State of Iowa; Governor Branstad; Lieutenant Governor Reynolds; Boeyink; Bird; Teresa Wahlert, Director of Iowa Workforce Development, who had supervisory authority over the Division of Workers' Compensation; and Tim Albrecht, Communications Director to the Governor. In Godfrey's amended petition, he asserted nineteen different claims against the various defendants, including claims arising under the ICRA and the Iowa Constitution.

---

[1]At trial, Senator Dotzler testified he mentioned Godfrey's sexual orientation to Boeyink while the two were attending an event at the Iowa Speedway in the spring of 2011. Boeyink denied Senator Dotzler had raised Godfrey's sexual orientation at any point prior to this phone call.

This case has come before this court on interlocutory appeal on two occasions. On the first occasion, we addressed the issue of immunity for state employees under the Iowa Tort Claims Act. *See Godfrey v. State* (*Godfrey I*), 847 N.W.2d 578, 582–83 (Iowa 2014). On the second occasion, we addressed whether Godfrey could sue for monetary damages for violations of the Iowa Constitution. *See Godfrey v. State* (*Godfrey II*), 898 N.W.2d 844, 871–72 (Iowa 2017). A majority of this court held the due process and equal protection provisions of the Iowa Constitution were self-executing and a plaintiff could assert a claim for monetary damages for alleged violations of the same. *See id.* A different majority of the court concluded, however, that Godfrey's claims for alleged violations of his constitutional rights predicated on sexual-orientation discrimination were not cognizable because the ICRA provided an adequate remedy. *See id.* at 880 (Cady, C.J., concurring in part and dissenting in part); *id.* at 882 (Mansfield, J., dissenting). Although this court held Godfrey could assert a claim for monetary damages for violations of the due process clause of the Iowa Constitution based on conduct unrelated to sexual-orientation discrimination, this court did not define the nature, scope, or elements of any such claim.

Godfrey's case came on for trial in June 2019. By that time, Godfrey had already resigned from his position as commissioner. He left the position in August 2014 and took a position with the Department of Labor in Washington, D.C. By the time of trial, some of the original defendants and most of the original claims had been dismissed. The remaining defendants were the State of Iowa, Governor Branstad, Boeyink, and Bird. The remaining claims were for sexual-orientation discrimination and retaliation in violation of the ICRA and claims for violations of Godfrey's rights to substantive and procedural due process. With respect to his

constitutional claims, Godfrey contended he had a "constitutionally protected property interest in continuing his annual salary at the level it was at when Defendant Branstad took office as Governor of the State of Iowa" and the defendants violated that right in reducing his salary within the statutory range.

A great deal of trial time was spent trying to prove the Republican Party of Iowa, ABI, and their respective members and employees held political positions that were "anti-gay." The district court allowed the evidence because, if the party were "anti-gay," then proof of affiliation with the Republican Party of Iowa would "make it more likely that a particular action was motivated by anti-gay animus." The district court reasoned the defendants' party affiliation, in and of itself, would show it was "more probable the employment actions taken against Godfrey were due to his sexual orientation." Similarly, the district court reasoned that if ABI were anti-gay, then it would make it more likely that Governor Branstad was motivated by discriminatory animus.

The plaintiff's evidence took several forms. Over the defendants' objections, the plaintiff was allowed to present or elicit evidence regarding the defendants' views, other Republican politicians' views, and ABI employee Gilliland's views on legal and political issues unrelated to the employment discrimination alleged in this case. The jury heard testimony regarding the *Varnum* decision, same-sex marriage, proposed amendments to the Iowa Constitution, same-sex adoption, anti-bullying laws, gubernatorial proclamations regarding gay rights, and Governor Branstad's failure to send an email to state employees regarding Pride Month. Gilliland was asked whether he agreed with *Varnum*, whether he supported an amendment to the Iowa Constitution, whether his preference for his own marriage was between a man and a woman, whether he

supported same-sex adoption, whether he believed "gay marriage has caused ancient societies to crumble," and whether he personally knew any "homosexual couples who are raising children."

Over the defendants' objection, the district court allowed Godfrey to call witnesses to provide lay opinion evidence that the Republican Party and its members were motivated by anti-gay animus based on events that occurred years prior to this case, had no connection to any of the defendants in this case, and had no connection to Godfrey's employment. For example, former State Senator McCoy, who came out as gay in 2003, testified about his experiences in the Iowa Senate during the time period 2000–2008. None of the defendants served in the legislature during that time period, and none of the defendants were involved in state government during that time period. McCoy testified about the failed confirmation of a gay man for the state board of education in 2003–2004, which McCoy attributed to Republican Party discriminatory animus. Based on that confirmation episode and the statements of other senators not connected to this case, McCoy opined the Republican Party was "anti-gay, very anti-gay." McCoy also testified those who oppose same-sex marriage are anti-gay, but he conceded on cross-examination he voted in favor of DOMA. Other witnesses provided similar opinion testimony.

Godfrey was also allowed to put into evidence what was alleged to be the Republican Party platform for 2010. Over the defendants' objection, the district court allowed a local businessman and columnist—who had no relation to the case—to lay foundation for the admission of what he claimed was the 2010 Republican Party platform. The witness testified he downloaded the document from the Republican Party website. The witness did not operate the website; did not work for the party; was not a member of the party; did not participate in drafting the platform; and had no

personal knowledge regarding who drafted the document, when it was drafted, whether it was a final or draft version of the platform, or the party's policies and practices with respect to archiving official documents. He read into evidence platform planks dealing with opposition to sexual-orientation education in public schools, opposition to an anti-bullying law, support for "traditional, two-parent (one male and one female) marriage-based families," support for the repeal of sexual orientation as a protected status under the ICRA, support for a constitutional amendment to define marriage as "one natural male and one natural female," opposition to civil marriage, opposition to same-sex adoption, and a requirement that duly nominated candidates agree with 80% of the platform to receive party funding. The witness was impeached with one of his own columns where he wrote, "[S]tate political platforms mean absolutely nothing, practical politicians agree."

One area in which evidence was excluded related to Godfrey's claim for emotional distress damages. Godfrey testified about the emotional distress he suffered as a result of the defendants' conduct. He testified it caused him sleep problems, caused him to pace, caused him to lose faith in authority figures, impacted his physical health and exercise, and caused him to start grinding his teeth (bruxism) at night. Godfrey's partner was also allowed to testify to the changes in Godfrey's physical and mental condition and emotional distress caused by the defendants' conduct.

The defendants attempted to use Godfrey's medical records and information obtained from those records to cross-examine Godfrey. The defendants wanted to establish a baseline with respect to Godfrey's mental condition and emotional distress, establish Godfrey had suffered from and received treatment for the same issues long prior to even meeting the defendants, and impeach Godfrey with prior inconsistent statements made

to his treatment providers. The plaintiffs moved to disallow the introduction of these medical records and moved to disallow any cross-examination or impeachment that was based upon information obtained from the medical records. The district court granted the plaintiff's motion.

In response to the court's ruling, defense counsel asked for clarification, "Does that mean[ ] I cannot ask him, for example, if he's, prior to meeting Terry Branstad, if he'd ever been prescribed any sort of medication, like antianxiety medication, Xanax to help him sleep, Wellbutrin, anything like that?" The district court responded, "That is correct." Defense counsel inquired further regarding the scope of the ruling:

> [COUNSEL:] First is emotional distress. Can I ask you, will you confirm, is it your ruling that I cannot ask Mr. Godfrey: Did you have prior problems sleeping or falling asleep prior to your salary being reduced by Governor Branstad?
>
> THE COURT: That is my ruling.
>
> [COUNSEL]: Is it your ruling that I cannot ask Mr. Godfrey if he had crying spells before 2011?
>
> THE COURT: That is correct.
>
> [COUNSEL]: And I assume it's your ruling that I cannot ask him if he had bouts of depression?
>
> THE COURT: Correct.
>
> [COUNSEL]: Nor can I ask him if he had teeth grinding prior to –
>
> THE COURT: Correct.
>
> [COUNSEL]: And I cannot ask him if he suffered lack of motivation to exercise prior to December 3rd of 2010?
>
> THE COURT: That's correct.
>
> [COUNSEL]: . . . I cannot ask him if he engaged in pacing before December 3rd of 2010?

THE COURT: That's correct.

[COUNSEL]: And I cannot ask him if he had loss of trust in authority figures before December 3rd, 2010?

THE COURT: That is correct as well.

. . . .

THE COURT: . . . And I would simply verify and confirm on the record that it is my opinion, when an individual is simply alleging garden-variety emotional distress damages, the fact that the individual has experienced similar-type feelings because of life events that have occurred in the past is not relevant.

The defendants made an offer of proof. The offer of proof showed prior to the date Godfrey received the resignation request, he already had been diagnosed with depression, acute reaction to stress, and anxiety. He had been prescribed medications for these conditions. The record showed Godfrey had been receiving mental-health therapy on a weekly or biweekly basis since 2007—three years prior to any of the events relevant to this case. For example, the record shows Godfrey was suffering from "acute reaction to stress with emotional disturbance." Godfrey had reported similar symptoms of emotional distress long before ever meeting the defendants, including: crying spells, grinding his teeth (bruxism), panic attacks, depression, and insecurity. The jury was not allowed to hear any of this evidence.

Against this backdrop of effectively unchallenged evidence regarding Godfrey's emotional distress, the jury found in favor of Godfrey and awarded him significant emotional distress damages. The jury awarded Godfrey $500,000 in emotional distress damages on his claims for sexual-orientation discrimination and retaliation against the State. The jury also awarded Godfrey $1,000,000 in emotional distress damages against Governor Branstad and Bird on Godfrey's constitutional claims. The jury

found Boeyink was entitled to qualified immunity. The State of Iowa, Governor Branstad, and Bird timely filed this appeal.

## II.

The defendants contend the district court erred in denying their motions for directed verdict and motion for judgment notwithstanding the verdict (JNOV) because they were entitled to judgment as a matter of law. Our review of the district court's rulings are for the correction of errors at law. *See Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 431 (Iowa 2019) (per curiam); *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (en banc). In reviewing the jury's verdict, we "view the evidence in the light most favorable to the party against whom the motion is made." *McClure*, 613 N.W.2d at 230.

## III.

We first address Godfrey's claims arising under the ICRA. The defendants contend they are entitled to judgment as a matter of law because the ICRA is not applicable under the facts and circumstances of this case and the jury's verdict was not supported by substantial evidence.

## A.

The defendants first contend the ICRA is inapplicable here. In their view, an appointed officer of the state is not an "employee" of the state within the meaning of the ICRA. *See* Iowa Code § 216.2(6). Whatever merit that argument may have in another case, it is too late to raise the argument in this case.

In the preceding appeal in this case, we considered whether Godfrey could pursue a sexual-orientation discrimination claim under article I, section 6 of the Iowa Constitution. *See generally Godfrey II*, 898 N.W.2d 844. The court divided 3–1–3 on the issue. *See id.* Three justices concluded that he could pursue such a claim. *See id.* at 879 (plurality

opinion). Three justices concluded that he could not. *See id.* at 882, 899 (Mansfield, J. dissenting). The middle justice, Chief Justice Cady, found that Godfrey could not pursue a constitutional claim but only because the ICRA provided an adequate legal remedy for Godfrey. *See id.* at 880 (Cady, C.J., concurring in part and dissenting in part). As the chief justice explained, "Godfrey alleges the State discriminated against him on the basis of his sexual orientation by harassing him and reducing his salary. These claims are covered by the ICRA." *Id.* Given this voting alignment, the chief justice's partial concurrence was the "dispositive" or controlling opinion. *See Wagner v. State*, 952 N.W.2d 843, 858 (Iowa 2020).

Under the reasoning of the partial concurrence, if Godfrey's sexual-orientation discrimination claims had *not* been covered by the ICRA, the partial concurrence would have joined the plurality in providing a fourth vote to find that Godfrey could pursue it under the Iowa Constitution. *See Godfrey II*, 898 N.W.2d at 880–81. Either way, Godfrey would have had a legal claim that could go forward if the facts supported it.

Moreover, the defendants advocated for this result in *Godfrey II*. They argued that even if direct claims could be brought under the Iowa Constitution, Godfrey's discrimination claims were "preempted" by the ICRA because the ICRA provides the exclusive remedy for conduct that it prohibits. Appellees' Final Brief and Argument at 9, *Godfrey II*, 898 N.W.2d 844 (No. 15–0695), 2015 WL 9582398. The first substantive header in the defendants' brief in *Godfrey II* was "PLAINTIFF'S STATE CONSTITUTIONAL CLAIMS ARE PREEMPTED BY CHAPTER 216." *Id.* The defendants declared that "[i]t is well settled that Chapter 216 provides the *exclusive* remedy *for conduct prohibited* by the Iowa Civil Rights Act ('ICRA')." *Id.* at 10 (second emphasis added). A majority of the court accepted these arguments and concluded the ICRA remedy was available

to Godfrey. *See Godfrey II*, 898 N.W.2d at 880; *id.* at 892–93 (Mansfield, J., dissenting) ("[T]he [ICRA] provides Godfrey with an adequate statutory remedy.").

The "law of the case" doctrine prevents us from reexamining decisions we have made in a prior appeal of the same case. *See Freer v. DAC, Inc.*, 951 N.W.2d 6, 8 (Iowa 2020) (per curiam); *Lee v. State*, 874 N.W.2d 631, 646 (Iowa 2016).

> Under the law of the case doctrine, "the legal principles announced and the views expressed by a reviewing court in an opinion, right or wrong, are binding throughout further progress of the case upon the litigants, the trial court and this court in later appeals."

*State v. Ragland*, 812 N.W.2d 654, 658 (Iowa 2012) (quoting *State v. Grosvenor*, 402 N.W.2d 402, 405 (Iowa 1987)). "It is a familiar legal principle that an appellate decision becomes the law of the case and is controlling on both the trial court and on any further appeals in the same case." *United Fire & Cas. Co. v. Iowa Dist. Ct.*, 612 N.W.2d 101, 103 (Iowa 2000) (en banc).

In addition, the rule of "judicial estoppel" prevents a party from changing its position after it has successfully urged a different position to obtain a certain litigation outcome. *See Wellmark, Inc. v. Iowa Dist. Ct.*, 890 N.W.2d 636, 645 n.5 (Iowa 2017); *Lee v. State*, 844 N.W.2d 668, 683 (Iowa 2014). The doctrine is "designed to protect the integrity of the judicial process." *Tyson Foods, Inc. v. Hedlund*, 740 N.W.2d 192, 196 (Iowa 2007) (quoting *Vennerberg Farms, Inc. v. IGF Ins.*, 405 N.W.2d 810, 814 (Iowa 1987)). In *Winnebago Industries, Inc. v. Haverly*, we discussed judicial estoppel at length, finding that it barred an employer from taking inconsistent positions at different stages of the same proceeding. *See* 727 N.W.2d 567, 573–75 (Iowa 2006). Because the doctrine primarily is

intended to protect the integrity of the legal process, an appellate court may raise judicial estoppel on its own motion. *See State v. Duncan*, 710 N.W.2d 34, 43–44 (Iowa 2006).

Both of these rules apply here. We decided in *Godfrey II* that the ICRA afforded a remedy to Godfrey for discrimination based on sexual orientation. 898 N.W.2d at 880 (Cady, C.J., concurring in part and dissenting in part); *id.* at 882 (Mansfield, J., dissenting). Moreover, the defendants sought that outcome to fend off potentially broader liability under article I, section 6 of the Iowa Constitution. If our court had taken the view in 2017 that Godfrey did not have a remedy for sexual-orientation discrimination under the ICRA, he undoubtedly would have been authorized by a majority of the court to go forward with the same claim under article I, section 6 of the Iowa Constitution. The ICRA thus applies here.[2]

## B.

The defendants contend there was insufficient evidence to establish Governor Branstad, the sole decision-maker in this case, knew Godfrey was gay prior to the time he reduced Godfrey's compensation. The defendants thus contend Godfrey's discrimination claim relating to events up to and including the salary reduction fails as a matter of law. In

---

[2]Justice McDermott's concurrence in part and dissent in part, joined by Chief Justice Christensen, concludes the ICRA is inapplicable here because Godfrey was an officer and not an employee of the State of Iowa. In reaching the merits of the defendants' argument, the dissent in part misapplies the doctrines of law of the case and judicial estoppel. If the dissent in part were correct, this matter would necessarily have to be remanded for retrial on Godfrey's constitutional claims for sexual-orientation discrimination because it would be unfair and prejudicial to the administration of justice for this court in one appeal to deny Godfrey the right to pursue constitutional claims for sexual-orientation discrimination because he had statutory claims and then in a subsequent appeal to deny Godfrey's statutory claims because he should have pursued constitutional claims this court said he could not pursue. We reject the dissent in part's approach and reject that opinion's unstated but necessary conclusion that Godfrey may now pursue a constitutional claim for sexual-orientation discrimination.

denying the defendants' motions for directed verdict and JNOV, the district court concluded there was substantial evidence Governor Branstad knew Godfrey was gay: Godfrey's sexual orientation was well known among the members of the legislature; members of ABI were aware of and discussed Godfrey's sexual orientation; and "[a]bundant evidence was presented to establish the Republican Party was 'anti-gay' in its policies and platform planks." We conclude the district court erred in denying the defendants' motions for judgment as a matter of law.

As relevant here, the ICRA makes it unlawful for an employer to discriminate against a person in employment "because of" the person's "sexual orientation." Iowa Code § 216.6(1)(*a*). Our cases have held that to prove an employment decision was "because of" an employee's protected status, the plaintiff must prove the protected status was a "motivating factor" in the employer's decision. *See Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 272 (Iowa 2019) ("Therefore, in discrimination and retaliation cases under ICRA, we apply the . . . motivating-factor standard in instructing the jury . . . ."); *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13–14 (Iowa 2009) (adopting motivating-factor standard for discrimination claims). *But see Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 582 (Iowa 2017) (distinguishing between significant-factor standard applied to retaliation claims and motivating-factor standard applied to discrimination claims).

To prove discrimination was because of an employee's membership in a protected class, the plaintiff must prove the decision-maker knew of the employee's membership in the protected class. It would be "counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant." *Geraci v. Moody-Tottrup, Int'l., Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). "[I]n the vast majority of

discrimination cases, the plaintiff's membership is either patent (race or gender), or is documented on the employee's personnel record (age). This case, however, is different." *Id.* Godfrey's sexual orientation is not patent or documented in any personnel record. In this type of case, "involving personal attributes not obvious to the employer, courts have regularly held that the plaintiff cannot make out a prima facie case of discrimination unless he or she proves that the employer knew about the plaintiff's particular personal characteristic." *Id.*; *see also Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 444 (6th Cir. 2002) (stating that to establish the protected characteristic was a motivating factor in the challenged decision, the employee must show the decision-maker had "actual knowledge" of the protected characteristic).

There is no evidence Governor Branstad, the sole decision-maker in this case, had actual knowledge of Godfrey's sexual orientation at any time prior to seeking Godfrey's resignation or reducing his salary within the statutory range. Governor Branstad left office in 1999, entered the private sector, and stayed out of politics. More than six years after Governor Branstad left office, Governor Vilsack appointed Godfrey interim commissioner. In 2007 and 2009, Governor Culver appointed Godfrey commissioner. There is no evidence Governor Branstad was at the capitol around the time of the confirmation hearings. There is no evidence Branstad spoke with any legislators around the time of the confirmation hearings. There is no evidence any legislator communicated to Branstad any information about Godfrey. There is no evidence Governor Branstad knew of or followed Godfrey's confirmation. Governor Branstad denied any knowledge of Godfrey's sexual orientation until Godfrey's public statements after Branstad had already implemented the salary reduction. There was no testimony from any witness that any person—whether an

elected official, member of Branstad's staff, representative from ABI, or any other person—told Governor Branstad Godfrey was gay, heard Governor Branstad make a comment regarding Godfrey's sexual orientation, or heard Governor Branstad even inquire about Godfrey's sexual orientation any time prior to the salary reduction.

In the absence of any direct evidence Governor Branstad had actual knowledge of Godfrey's sexual orientation, Godfrey relies on circumstantial evidence. Of course, "[c]ircumstantial and direct evidence are equally probative." *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 800 (Iowa 1984). However, circumstantial evidence is sufficient to establish a fact only where the evidence has sufficient force to allow a factfinder to draw a legitimate inference from the evidence presented. *See id.* A legitimate inference drawn from circumstantial evidence must be "rational, reasonable, and otherwise permissible under the governing substantive law." *McIlravy v. N. River Ins.*, 653 N.W.2d 323, 328 (Iowa 2002) (quoting *Butler v. Hoover Nature Trail, Inc.*, 530 N.W.2d 85, 88 (Iowa Ct. App. 1994)). An inference is not legitimate if it is based upon suspicion, speculation, conjecture, surmise, or fallacious reasoning. *See Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1271 (N.D. Ga. 2002) ("[A]n inference would be unreasonable if it is reached through fallacious reasoning."), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003); *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 545 (Iowa 2018); *Willey v. Riley*, 541 N.W.2d 521, 527 (Iowa 1995) ("Circumstances are not sufficient when the conclusion in question is based on surmise, speculation or conjecture." (quoting *Harsha*, 346 N.W.2d at 800)). "Under our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the rights of citizens when no question for the jury is involved, as it is to deny to a citizen his

trial by jury when he has the right." *Easton v. Howard*, 751 N.W.2d 1, 6 (Iowa 2008) (quoting *True v. Larimore*, 255 Iowa 451, 460, 123 N.W.2d 5, 10 (1963)).

Numerous other courts have addressed the sufficiency of evidence to establish a decision-maker knew a plaintiff's sexual orientation prior to making an employment decision. In *Hung Nguyen v. Regents of the University of California*, an associate professor sued his university and the relevant decision-makers after he was denied tenure. *See generally* 8:17-cv-00423-JVS-KES, 2018 WL 5886018 (C.D. Cal. Sept. 17, 2018), *aff'd*, 823 F. App'x 497 (9th Cir. 2020). The defendants denied knowledge of the plaintiff's sexual orientation. *See id.* at *8. The plaintiff argued the "[d]efendants had knowledge of his sexual orientation based on circumstantial evidence." *Id.* at *7. The plaintiff contended the defendants must have known his sexual orientation because the plaintiff was openly gay, many people in the department where he worked knew his sexual orientation, and he hosted dinner parties and social events. *See id.* at *8. The court held the defendants were entitled to judgment as a matter of law. *See id.* at *9. Evidence that people other than the decision-makers were aware of the plaintiff's sexual orientation was insufficient to create a fact issue for the jury where the decision-makers denied knowledge of the plaintiff's orientation and there was "no evidence that any of the individuals who affirmatively knew [the plaintiff] was gay communicated that information to" the decision-makers. *Id.* at *8.

In *Nealis v. Molecular Health, Inc.*, the Massachusetts Appeals Court held evidence the plaintiff was openly gay and many people knew the plaintiff was gay was insufficient to establish a prima facie case of sexual-orientation discrimination where there was no evidence the decision-maker was aware of the plaintiff's sexual orientation:

First, we agree with the judge that Nealis failed to raise a triable issue of fact that Salyani knew Nealis's sexual orientation during the period Nealis alleges he was discriminated against. Salyani testified in his deposition that he first learned of Nealis's sexual orientation when he was informed that Nealis had lodged a discrimination complaint against him and that an investigation was forthcoming. To counter this testimony, Nealis offered evidence that he was "openly gay" at Molecular in that he "did not hide" his sexual orientation, which was "well-known" within the company. He also offered evidence that many Molecular employees learned that Nealis was gay during company "roundtable" discussions, which Nealis described as "casual social meetings." However, it is undisputed that Salyani did not attend these roundtable discussions, and otherwise spent approximately forty percent of his working time in the Boston office. And Nealis admitted, "I can't speak to the remote workers. I can't speak to [whether] Mr. Salyani [knew I was gay]."

20-P-159, 2021 WL 1811730, at *4 (Mass. App. Ct. May 6, 2021) (alterations in original).

In *Epstein v City of New York,* the district court granted the employer's motion for summary judgment where there was no evidence the decision-makers knew he was gay. *See* No. 06 Civ. 3788(TPG), 2009 WL 2431489, at *5–6 (S.D.N.Y. Aug. 6, 2009). The plaintiff contended there was a triable issue of fact because there was generalized evidence that some of his coworkers knew his sexual orientation. *See id.* at *5. The court held that it was pure conjecture to conclude the decision-makers knew he was gay. *See id.*

Godfrey contends there was evidence from which the jury could have inferred that those close to Governor Branstad may have known Godfrey's sexual orientation. Democratic Senator Courtney testified Godfrey brought his partner to his confirmation hearing and met then-Senator Reynolds. Democratic Senator Dotzler testified he told Boeyink that Godfrey was gay in the spring of 2011—after Branstad sent the resignation request but before Branstad reduced Godfrey's salary. And Boeyink and

Bird testified that they learned Godfrey might have been gay several days after Branstad decided to reduce Godfrey's salary. But this evidence does not change the equation. None of these people informed Governor Branstad of Godfrey's sexual orientation. On this record, any inference to the contrary is pure speculation. "Speculation . . . is not evidence and a case should not be submitted to a jury for deliberation when no evidence has been presented." *Willey*, 541 N.W.2d at 527.

The United States Court of Appeals for the Seventh Circuit reached a similar conclusion in *Igasaki v. Illinois Department of Financial & Professional Regulation*, 988 F.3d 948 (7th Cir. 2021). There, the court held the plaintiff's claim for sexual-orientation discrimination failed as a matter of law because the plaintiff "did not present evidence that [the decision-maker] even knew he was gay." *Id.* at 959 n.5. The court rejected the plaintiff's contention that he created a triable issue of fact because someone "very close" to the decision-maker knew the plaintiff's sexual orientation. *Id.* The court explained while the plaintiff was entitled "to all reasonable inferences in [his] favor, 'inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.' " *Id.* (alteration in original) (quoting *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)).

Similarly, in *Andrade v. Lego Systems, Inc.*, the plaintiff sued his employer for sexual-orientation discrimination, and the court held the defendants were entitled to judgment as a matter of law. *See* 205 A.3d 807, 810 (Conn. App. Ct. 2019) (per curiam). The decision-maker "testified in her affidavit that (1) she never knew that the plaintiff was gay; (2) neither the plaintiff nor anyone else told her he was gay; and (3) the plaintiff never did or said anything that led her to believe he was gay." *Id.* at 816. The plaintiff conceded this but contended there was a triable issue of fact

because he once referred to "his partner" when speaking with the decision-maker. *See id.* The court rejected the argument as mere speculation.

> Such speculation is particularly troubling here when the plaintiff admits that there is absolutely no other evidence to support the inference the plaintiff suggests. The plaintiff has not offered the testimony of a former coworker or anyone else to suggest that there was reason . . . to believe that [the decision-maker] knew that the plaintiff was gay.

*Id.*

The evidence presented in this case is far weaker than that presented in the above-discussed cases. In those cases, the plaintiff and the defendants worked for the same employer and were familiar with each other. Here, Governor Branstad sent a form letter to thirty appointed officials, including Godfrey, prior to ever meeting Godfrey. Branstad was not involved in government at the time of Godfrey's appointment, had never worked a single day with Godfrey, and had never worked a single day with any of Godfrey's coworkers. Even after they met for the first and only time, Godfrey and Governor Branstad worked in separate buildings and had no further communication or contact with each other.

We reject as illogical and fallacious the district court's conclusion that a jury could infer Governor Branstad knew Godfrey was gay because there was "[a]bundant evidence . . . presented to establish the Republican Party was 'anti-gay' in its policies and platform planks."[3] The district court's reasoning fails at several levels. First, it does not logically follow that the Republican Party's political position on issues related to sexual orientation, such as same-sex marriage or adoption, means that the party is "anti-gay" in the sense that it is opposed to the rights of gay persons to

---

[3]The defendants have appealed the district court's evidentiary rulings admitting much of this evidence. We need not resolve the admissibility issue because the evidence does not create a jury question on whether Governor Branstad knew Godfrey was gay.

a workplace free from sexual-orientation discrimination. Indeed, the record in this case disproves the inference. Governor Vilsack voted in favor of DOMA, but he appointed Godfrey to the position of commissioner. Governor Culver stated that he "personally believe[d] that marriage is between a man and a woman," but he appointed Godfrey to the position of commissioner twice. Governor Branstad, in the election of 2010, expressed his view that the citizens of Iowa should be allowed to vote on a marriage amendment to the Iowa Constitution, but several months after the election he appointed an openly gay man to serve as Director of the State–Federal Relations Office. Even Godfrey testified that an individual's party affiliation and views on "gay issues" are not necessarily correlated.

Second, even if we assume the evidence established the Republican Party was "anti-gay" in the sense the party was opposed to the rights of gay persons to a workplace free from sexual-orientation discrimination, the evidence does not support a logical inference that Governor Branstad was anti-gay. The district court committed the fallacy of division in concluding that what is true of the party must also be true of each of its individual members. *See Silvester v. Becerra*, 138 S. Ct. 945, 949 n.5 (2018) (mem.) (Thomas, J., dissenting from the denial of certiorari) (discussing the fallacy of division); *Christian v. Generation Mortg. Co.*, No. 12 C 5336, 2013 WL 2151681, at *3 (N.D. Ill. May 16, 2013) (" '[T]he fallacy of division' [is] the deductive error inherent in substituting evidence of the general for evidence of the particular."); Adrian Vermeule, *Foreword: System Effects and the Constitution*, 123 Harv. L. Rev. 4, 8 (2009) (defining fallacy of division as "the assumption that what is true of the aggregate must be true of the members"). The evidence admitted to establish the Republican Party was anti-gay is not relevant to the question of whether

Governor Branstad had actual knowledge of the plaintiff's sexual orientation.

Third, even if we assume this evidence would support an inference that Governor Branstad was anti-gay, that inference would only support a further inference that Governor Branstad was motivated by discriminatory animus if there was evidence he had actual knowledge of the plaintiff's sexual orientation. There was no evidence Governor Branstad had actual knowledge of Godfrey's sexual orientation prior to reducing Godfrey's salary within the statutory range.

Finally, Godfrey testified it was his personal belief that Governor Branstad knew he was gay and discriminated against him because he was gay, but there was no evidence to support Godfrey's personal belief. Godfrey's personal, conclusory beliefs are insufficient as a matter of law to generate a fact question for the jury. *See, e.g.*, *Kazar v. Slippery Rock Univ. of Pa.*, Civil No. 13-60, 2016 WL 1247233, at *4 n.10 (W.D. Pa. Mar. 30, 2016) (holding "bald conclusory statement that [decision-makers] knew or should have known [plaintiff's] sexual orientation" and rumors regarding plaintiff's sexual orientation were insufficient as a matter of law to establish decision-makers knew plaintiff's sexual orientation), *aff'd*, 679 F. App'x 156 (3d Cir. 2017); *Etheredge v. Henry*, 95 F. Supp. 3d 793, 806 n.13 (M.D. Pa. 2015) (holding that mere assertions that defendants "all knew plaintiff was gay" was insufficient to create a fact issue for the jury); *Taylor v. Polygram Recs.*, No. 94 CIV. 7689(CSH), 1999 WL 124456, at *16 (S.D.N.Y. Mar. 8, 1999) (plaintiff's "belief, based on no evidence other than gut instinct, that [her supervisor] treated her with hostility because of her race, cannot justifiably support an inference of discrimination" when not supported by other evidence (emphasis omitted)).

After reviewing the relevant case law and evidence in the light most favorable to Godfrey, we conclude Godfrey failed to present sufficient evidence to establish Governor Branstad knew Godfrey's sexual orientation at the time Branstad requested Godfrey's resignation or reduced his salary. In the absence of such evidence, Godfrey failed to prove the defendants' actions were taken because of Godfrey's sexual orientation. The defendants are entitled to judgment on Godfrey's sexual-orientation discrimination claim arising under the ICRA with respect to all allegations of discrimination prior to and including the salary reduction. *See, e.g.*, *Fry v. Ascension Health Ministry Servs.*, Case No. 18-CV-1573, 2021 WL 1733397, at \*7 (E.D. Wis. May 3, 2021) (granting summary judgment where decision-makers were not even aware of the plaintiff's sexual orientation until after his employment ended); *Thomas v. Coleman Enters.*, No. C6-99-1327, 2000 WL 385479, at \*5 (Minn. Ct. App. Apr. 18, 2000) (affirming grant of summary judgment where plaintiff failed to make a prima facie case because "appellant presented no evidence establishing [the decision-maker] was even aware of appellant's sexual orientation").

## C.

We next address Godfrey's retaliation claim arising under the ICRA as it relates to events up to and including the salary reduction. The defendants contend they were entitled to judgment as a matter of law on this claim because Godfrey did not engage in statutorily protected activity prior to the time Governor Branstad reduced his salary within the statutory range. The district court denied the defendants' motions for directed verdict and JNOV, concluding that Godfrey's mere refusal to resign constituted statutorily protected activity. We conclude the district court erred in denying the defendants' motions for judgment as a matter of law.

The ICRA provides it shall be an unfair or discriminatory practice for

> [a]ny person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.

Iowa Code § 216.11(2). To prevail on a statutory retaliation claim, the plaintiff must show "(1) that he or she engaged in statutorily protected activities; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Sellers v. Deere & Co.*, 23 F. Supp. 3d 968, 986 (N.D. Iowa 2014) (quoting *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007)), *aff'd*, 791 F.3d 938 (8th Cir. 2015); *see also Haskenhoff*, 897 N.W.2d at 582 (discussing retaliation claim). To establish a causal connection, the plaintiff must show the plaintiff's protected activity was a motivating factor in the employer's subsequent adverse employment action. *See Hawkins*, 929 N.W.2d at 272.

At issue here is the opposition clause of the ICRA and whether Godfrey's mere refusal to resign constituted lawful opposition to a practice forbidden by the ICRA. *See* Iowa Code § 216.11(2). We have not previously interpreted this clause of the ICRA. However, the question has been addressed by federal courts interpreting the parallel provision of Title VII, and we take guidance from those interpretations. *See Hawkins*, 929 N.W.2d at 269 ("In interpreting our civil rights statute, we have looked at the similarities between the language used in the federal and our civil rights acts."). The United States Supreme Court explained:

> The opposition clause makes it "unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because he has opposed any practice made . . . unlawful . . .

by this subchapter." § 2000e–3(a). The term "oppose," being left undefined by the statute, carries its ordinary meaning: "[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1957).

*Crawford v. Metro. Gov't*, 555 U.S. 271, 276, 129 S. Ct. 846, 850 (2009) (alterations and omissions in original) (citation omitted). Under the opposition clause, an employee engages in statutorily protected activity where the employee opposes conduct he reasonably believes constitutes unlawful discrimination. *See Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam). Although "[m]agic words are not required, . . . protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Id.*; *see also Okoli v. City of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011) (stating that protected activity was shown when the plaintiff complained of "harassment" and described some of the particular acts of harassment but did not use the term "sexual harassment"); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (holding that the jury reasonably concluded the plaintiff engaged in opposition activity when the plaintiff told the defendant "to stop his offensive behavior").

There is no evidence here to show Godfrey engaged in protected activity before Governor Branstad reduced his salary within the statutory range. On December 3, 2010, Governor Branstad sent Godfrey a resignation request. On December 6, Godfrey sent a letter to the Governor-elect declining the request. The letter provided:

> I have received your December 3, 2010 correspondence requesting a letter of resignation prior to December 15, 2010. I was nominated for the position of Iowa Workers' Compensation Commissioner in February 2009. I was confirmed by the Iowa Senate on March 30, 2009. Iowa Code section 86.1 sets the term of the workers' compensation commissioner as 6 years beginning and ending as provided in Iowa Code section 69.19. Iowa code section 69.19 states that

the term of appointment confirmed by the senate shall begin at 12:01 a.m. on May in the year of appointment and expire at 12:00 midnight on April 30 in the year of expiration. Therefore my current term commenced on May 1, 2009 and will not expire until April 30, 2015. As I plan to fulfill my term in office, I respectfully decline your request for a letter of resignation.

There is nothing in the letter that would have alerted the defendants that unlawful discrimination was at issue.

Likewise, there is no evidence that Godfrey engaged in protected activity in the two meetings he had with the defendants. On December 29, Godfrey met with Branstad, Reynolds, and Boeyink. The Governor asked for Godfrey's resignation, and Godfrey refused. In the remainder of the meeting, Godfrey explained his reasons for wanting to serve out the remainder of his term. Godfrey testified the meeting was very cordial, productive, and went really well. The July 11, 2011, meeting lasted only a few minutes. Boeyink requested Godfrey's resignation, and Godfrey refused. Boeyink then communicated the salary reduction. Godfrey's sexual orientation was not raised in either meeting. Godfrey did not say or do anything that would have alerted the defendants Godfrey was making a complaint about or opposing unlawful discrimination.

Godfrey's mere refusal to resign, without more, does not constitute protected activity. *See Ideyi v. State Univ. of N.Y. Downstate Med. Ctr.*, No. 09–CV–1490 (ENV)(RML), 2010 WL 3938411, at *6 (E.D.N.Y. Sept. 30, 2010) (holding the mere "refusal to resign" was not protected activity). As one court explained, no case law supports the proposition that the mere refusal to resign constitutes a protected complaint or protected opposition:

> [The plaintiff] asserts that his refusal to retire when he was demoted constituted the requisite opposition to an unlawful practice. [He] asserts that his supervisors retaliated against him following his refusal to resign by transferring him to distant locations and by refusing his own request for transfer back to Dulles. However, this Court can find no case law

> which suggests that protected "opposition" extends . . . to the sort of stoic, silent endurance plaintiff alleges here.

*Beeck v. Fed. Express Corp.*, 81 F. Supp. 2d 48, 55 (D.D.C. 2000).  This conclusion is compelled both by the text of the statute and its underlying purpose.  The purpose of the retaliation provision "is to let employees feel free to express condemnation of discrimination . . . .  That purpose is hardly served by imposing sanctions upon employers who take action against employees who never communicate their concern about unlawful discrimination."  *Zokari v. Gates*, 561 F.3d 1076, 1082 (10th Cir. 2009) (quoting *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002)).

In the absence of evidence that the basis for refusal is grounded in opposition to an alleged discriminatory action, as is the case here, the defendants are entitled to judgment as a matter of law with respect to all allegations of retaliation prior to and including the salary reduction.  *See Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 289 (Iowa 2000) (en banc) ("Of course, if the employer has no knowledge the employee engaged in the protected activity, causation cannot be established."); *see also Blackmon v. Escambia Cnty. Sch. Bd.*, 568 F. App'x 848, 850 (11th Cir. 2014) (per curiam) (holding plaintiff's refusal to accept a work assignment, without more, was not protected activity); *Davis v. Dall. Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (per curiam) (holding plaintiff's refusal to accept new position was not protected activity where the plaintiff made only a "vague complaint, without any reference to an unlawful employment practice under Title VII"); *Zokari*, 561 F.3d at 1082 ("Although Mr. Zokari may have refused the English class because he felt that the request was discriminatory, he has not presented evidence that he made this basis of his refusal known to his supervisors.  He never told them of

his belief that their request constituted improper discrimination based on his race or national origin."); *Skaggs v. Van Alstyne Indep. Sch. Dist.*, CIVIL ACTION NO. 4:16-CV-00227-CAN, 2017 WL 77825, at *17 (E.D. Tex. Jan. 9, 2017) ("Here, Plaintiff alleges her refusal to retire from teaching . . . constitutes a protected activity . . . . Plaintiff's testimony reveals, however, that she merely rebuffed Coleman any time the topic arose, never alerting him to any belief that his suggestions (or any other behavior) constituted unlawful discrimination . . . ."); *Lard v. Ala. Alcoholic Beverage Control Bd.*, Civil Action No. 2:12–cv–452–WHA, 2012 WL 5966617, at *3 (M.D. Ala. Nov. 28, 2012) (holding that "refusal to resign when ordered to do so" was not an act of opposition that constituted protected activity where employee did not communicate anti-discriminatory basis for refusal); *Finlay v. Beam Glob. Spirits & Wine, Inc.*, Civil Action No. 10 C 5622, 2012 WL 1952642, at *3 (N.D. Ill. May 30, 2012) (holding the refusal to sign witness statement was not protected activity where plaintiff offered other reasons for refusing to sign that had nothing to do with discrimination); *Bryant v. Verizon Commc'ns Inc.*, 550 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) ("It is undisputed that Plaintiff never complained about race or gender discrimination to anyone at Verizon. Plaintiff's refusal to accept a transfer cannot be construed as a 'protest . . . oppos[ing] statutorily prohibited discrimination' on the undisputed facts of this case." (alteration and omission in original)).

D.

After Governor Branstad reduced Godfrey's salary within the statutory range, Godfrey continued to serve as the workers' compensation commissioner for another three years until August 2014, when Godfrey left for a different position with the Federal Department of Labor. The core of Godfrey's claims against the defendants related to the Governor's

request for Godfrey's resignation and the Governor's decision to reduce Godfrey's salary, which, as discussed above, fail as a matter of law. However, Godfrey contends the defendants discriminated against him and retaliated against him between July 2011, when Godfrey first made an accusation of sexual-orientation discrimination, and August 2014, when Godfrey resigned his position. Godfrey identifies several acts of alleged discrimination and retaliation that occurred during this three-year period. The defendants contend the specified acts are insufficient, as a matter of law, to establish actionable adverse action. We agree.

To establish a claim for unlawful discrimination or retaliation, the plaintiff must show his employer took adverse action against him. With respect to discrimination claims, the plaintiff must show the defendants took adverse action that detrimentally affected the material terms, conditions, or privileges of the plaintiff's employment. *See Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862 (Iowa 2001). Adverse employment actions can include a loss of title, demotion, and termination. *See Haskenhoff*, 897 N.W.2d at 587. With respect to retaliation claims, the adverse action does not need to be employment-related to be unlawful. *See id.* at 587–88. However, the adverse action must still be *material*. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006). That is, the adverse action must produce an actual "injury or harm" to the plaintiff. *See id.* at 67, 126 S. Ct. at 2414. And the actual injury or harm must be sufficiently severe such that it would "dissuade a reasonable person from making or supporting an allegation of discrimination or harassment." *Haskenhoff*, 897 N.W.2d at 588–89; *see also Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415. An "action is not adverse merely because the employee does not like it or disagrees with it."

*Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 742 (Iowa 2003).

In determining whether the defendants' conduct was materially adverse, Godfrey contends this court should look at the cumulative effect of isolated incidents. We disagree. In a claim for discrimination or retaliation, "[e]ach discrete discriminatory act or event is separately actionable." *Id.* at 741. In contrast, "claims of hostile work environment are fundamentally different. Unlike discrete acts of discrimination, they involve repeated conduct and are based on the cumulative impact of separate acts." *Id.* Similarly, "[a] plaintiff may bring a 'special type of retaliation claim based on a "hostile work environment" ' by alleging a series of 'individual acts that may not be actionable on [their] own but become actionable due to their cumulative effect.' " *Menoken v. Dhillon*, 975 F.3d 1, 5–6 (D.C. Cir. 2020) (second alteration in original) (quoting *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015)). Here, Godfrey dismissed his hostile work environment claims and pursued only discrete discrimination and retaliation claims. Under these circumstances, we look at each of the discrete acts in isolation. *See Dindinger v. Allsteel, Inc.*, 860 N.W.2d 557, 571 (Iowa 2015) ("[I]n *Farmland Foods*, we aligned ourselves with the unanimous view of the Supreme Court . . . that the continuing violation doctrine does not apply to cases involving discrete discriminatory acts, as opposed to hostile work environment claims.").

Federal circuit courts have adopted the same approach. As the Eighth Circuit explained:

> Finally, Liles repeatedly criticizes the district court for "evaluating Plaintiff's claims of discriminatory and hostile acts as discrete acts rather than an ongoing series of discriminatory acts." To that end, Liles cites *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L.Ed.2d 106 (2002), and a handful of other cases

for the proposition that "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." What Liles fails to acknowledge is that these comments apply to hostile work environment claims which are, by their very nature, "based on the cumulative effect of individual acts." *Id.* In the retaliation context, however, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114, 122 S. Ct. 2061.

*Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 820–21 (8th Cir. 2017) (alterations in original); *see also Salemi v. Colo. Pub. Emps.' Ret. Ass'n*, 747 F. App'x 675, 689 (10th Cir. 2018) ("[C]ase law makes clear that the continuing violation theory is not available in the context of a Title VII claim based on discrete incidents of discrimination or retaliation . . . ."); *Birch v. City of New York*, 675 F. App'x 43, 44–45 (2d Cir. 2017) (holding alleged acts of retaliation were discrete acts separately actionable); *Taylor v. Donahoe*, 452 F. App'x 614, 620 (6th Cir. 2011) (analyzing separately "discrete acts of alleged retaliation (or discrimination)").

Godfrey first challenges the Governor's political speech. Godfrey contends Governor Branstad acted illegally in making public statements critical of Godfrey's job performance. In our view, the Governor's public statements regarding his perception of Godfrey's job performance do not rise to the level of adverse action. *See, e.g., Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) (holding that defendants' counterclaims and corresponding press release made in response to discrimination plaintiff's attraction of media attention were not actionable as a matter of law). This general proposition applies with particular force here because the Governor is an elected official responding to a public accusation of unlawful conduct.

The Massachusetts Supreme Judicial Court dealt with the same issue regarding the statements of elected officials in *Bain v. City of Springfield*, 678 N.E.2d 155 (Mass. 1997). In that case, an employee of the city sued the city for sex discrimination and retaliation. *See id.* at 157. The local newspaper published the charges against the city and the mayor, and the mayor responded with public statements that the complaint was baseless and that the plaintiff was trying to manipulate the system for personal gain. *See id.* at 157–58. The *Bain* court rejected the plaintiff's argument that the mayor's public comments could support a claim for retaliation:

> What we most emphatically cannot countenance as an instance of retaliation is the mayor's response in the local newspaper to the charges against him. The newspaper quoted Bain's serious and damaging charges against the mayor, an elected official. He was entitled to respond in the same forum, to defend himself and to state what political judgments seemed appropriate so long as they were not defamatory—which these were not. . . . Although the commission's interpretations of the antidiscrimination laws are entitled to deference, its interpretations are subject to constitutional guarantees of freedom of speech. The interest in remedying discrimination is weighty but not so weighty as to justify what amounts to a restriction on core political speech.

*Id.* at 161. We agree with the *Bain* court. In this context, the Governor's public statements made in response to the charge of unlawful conduct are not actionable under the ICRA as a matter of law.

Godfrey also challenges the Governor's Office's failure to speak. By way of background, in November 2011 Godfrey was selected for membership on the board of directors of the National Academy of Social Insurance. Godfrey, or the public information officer at Iowa Workforce Development (of which the Iowa Division of Workers' Compensation is a part), wrote a press release praising Godfrey for the selection and forwarded the press release in an email to Albrecht, the Governor's

communications director, with the question, "Thoughts?" Albrecht could not recall whether he responded to the email, but he testified agency public information officers were generally allowed to issue press releases without permission from the Governor's Office. Ultimately, the press release was not issued by anyone.

We conclude the failure to issue a positive press release is not a material adverse action. *See, e.g., AuBuchon v. Geithner*, 743 F.3d 638, 645 (8th Cir. 2014) (stating the failure to "adequately laud" the plaintiff's job performance was not unlawful retaliation); *Crudder v. Peoria Unified Sch. Dist. No. 11*, 468 F. App'x 781, 784 (9th Cir. 2012) (holding the employer's "failure to publish a press release announcing" the plaintiff's job promotion was not sufficient adverse action to support a retaliation claim); *Leatherbury v. C & H Sugar Co.*, 911 F. Supp. 2d 872, 882 (N.D. Cal. 2012) (withholding praise was not actionable adverse action), *aff'd*, 607 F. App'x 676 (9th Cir. 2015). Godfrey concedes as much in his brief, stating "this incident is likely not an adverse employment action all by itself."

Godfrey also claims Governor Branstad and his appointees acted unlawfully in exercising budgetary authority over the Division of Workers' Compensation. Specifically, Godfrey challenges the oversight of his budget by the director of workforce development. Second, Godfrey challenges the reversion of unused funds from the Division of Workers' Compensation back to the Department of Iowa Workforce Development. Third, Godfrey challenges the Governor's line-item veto of funds earmarked to the Division of Workers' Compensation for a new deputy director position.

We hold none of these acts of alleged discrimination or retaliation constitute actionable adverse action. First, the Governor's management of the budget of a department of the executive branch and the exercise of

the line-item veto are constitutional powers to be exercised wholly at the discretion of the governor and cannot serve as grounds for a claim under the ICRA. *See* Iowa Const. art. III, § 16 (setting forth veto power); *id.* art. IV, § 1 (vesting the supreme executive power of this state in the governor). Second, the director of workforce development has statutory authority to "prepare, administer, and control the budget of the department and its divisions," which includes the Division of Workers' Compensation. Iowa Code § 84A.1(3)(*a*). The director of workforce development's oversight of the Division of Workers' Compensation is thus not unlawful; it is statutorily required. Godfrey's contention that the director exercised undue scrutiny of the division's budget does not rise to the level of adverse action. *See also Forkkio v. Powell*, 306 F.3d 1127, 1132 (D.C. Cir. 2002) (stating aggressive supervision did not support a claim for retaliation); *Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 478 (W.D.N.Y. 2005) ("Moreover, increased scrutiny or general monitoring does not rise to the level of an adverse employment action."). Third, the reduction in the budget of a government agency or the denial of additional financial support to a government agency, generally, is harm or injury to the agency and not the plaintiff managing the agency. In the absence of a showing of harm or injury to the plaintiff, the conduct does not rise to the level of an adverse action. *See Burlington N.*, 548 U.S. at 67, 126 S. Ct. at 2414. Thus, the denial of funding or additional support to a government agency "cannot be the basis for a retaliation claim." *Taylor v. Mills*, 892 F. Supp. 2d 124, 145 (D.D.C. 2012) (quoting *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 76 (D.D.C. 2007)). "To hold otherwise would give every overworked [government] employee in an understaffed office fodder for a [discrimination] claim." *Rattigan*, 503 F. Supp. 2d at 76; *see also Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 170 (D.D.C. 2013) (holding that

elimination of staff positions in government office plaintiff supervised was not a materially adverse action).

Finally, Godfrey argues the defendants failed to conduct a formal performance evaluation and failed to invite him to a leadership retreat in October 2011. The retreat was held for certain state officers and employees the Governor deemed part of his team. Neither of these omissions rises to the level of an adverse action. *See, e.g., Drielak v. Pruitt*, 890 F.3d 297, 300 (D.C. Cir. 2018) (holding exclusion from a meeting was not materially adverse); *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) ("Dillon's exclusion from certain meetings did not constitute adverse employment actions."); *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007) (holding the following did not amount to retaliation as a matter of law: the "failure to provide training and orientation, denying her access to needed employment tools, failure to reinstate her to her prior position, interfering with her authority, unfairly adding negative reports and reprimands to her personnel file, treating her differently than her coworkers, excluding her from meetings, giving her a negative evaluation, denying her training, and adding days to a training assignment at a different unit"); *Watson v. City of Cleveland*, 202 F. App'x 844, 855 (6th Cir. 2006) (holding that plaintiff did not make out a prima facie case for retaliation because "exclu[sion] from some meetings" did not constitute adverse action); *Kavanaugh v. Miami-Dade County*, 775 F. Supp. 2d 1361, 1369 (S.D. Fla. 2011) (missing one meeting was not an adverse action as a matter of law); *Montalvo Rios v. Municipality of Guaynabo*, 743 F. Supp. 2d 62, 71 (D.P.R. 2010) ("For purposes of a Title VII retaliation claim, menacing looks, name calling, exclusion from meetings, or being shunned by co-workers does not constitute an adverse employment action."), *reconsideration granted in part and denied in part*, Civil No. 10–1293 (SEC),

2011 WL 1258618 (D.P.R. Mar. 24, 2011); *Riley v. Honeywell Tech. Sols., Inc.*, Civil No. BEL-05-2426, 2008 WL 11444189, at *13 (D. Md. Apr. 16, 2008) (holding the failure to conduct or complete performance evaluations and exclusion from meetings did not rise to the level of adverse action to support retaliation claim), *aff'd*, 323 F. App'x 276 (4th Cir. 2009) (per curiam); *Davis*, 389 F. Supp. 2d at 476, 478 (holding "exclusion from meetings" was not adverse action); *Marshall v. State of N.Y. Div. of State Police*, 18 F. Supp. 2d 194, 203 (N.D.N.Y. 1998) (holding "fact that [p]laintiff was displeased when not asked to attend meetings" was not an adverse action).

E.

For these reasons, we conclude the district court erred in denying the defendants' motions for directed verdict and for judgment notwithstanding the verdict with respect to Godfrey's claims arising under the ICRA.

IV.

We lastly address Godfrey's constitutional claims. In *Godfrey II*, this court held the due process clause of the Iowa Constitution was self-executing and Godfrey could pursue a claim for monetary damages for violations of the due process clause based on conduct unrelated to sexual-orientation discrimination. *See* 898 N.W.2d at 871–72 (plurality opinion). However, the court did not define the nature, scope, or elements of any such claim and took no view on the merits of the claim. *See id.* at 876 ("Nonetheless, the question of the merits of Godfrey's property claim cannot be resolved at this time. It goes without saying, of course, that we take no view on the merits of any due process claim raised in this case."). The parties had the opportunity to develop the nature, scope, and elements of the claim at trial. Godfrey claimed, and the jury was instructed, he had

a "constitutionally protected property interest in continuing his annual salary at the level it was at when Defendant Branstad took office as Governor of the State of Iowa" unless Governor Branstad lowered Godfrey's salary in accord with 2008 Iowa Acts chapter 1191, section 13. The jury found in favor of Godfrey on this constitutional claim. The defendants contend they are entitled to judgment as a matter of law on this claim.

A.

The defendants first request this court reconsider its decision in *Godfrey II* that the equal protection and due process clauses of the Iowa Constitution are self-executing and a plaintiff can assert a claim for monetary damages for alleged violations of the same. The defendants argue we should reconsider our constitutional tort jurisprudence. We decline to reconsider our constitutional tort jurisprudence in this case because it is the law of the case. *See Ragland*, 812 N.W.2d at 658.

B.

The defendants next contend Godfrey has no constitutionally protected property interest in continuing his annual salary in a particular amount or in a particular process to determine his annual salary. For the reasons set forth below, we agree.

"Before a deprivation of due process can be claimed, a person must demonstrate entitlement to a . . . property interest that has been violated." *Notelzah, Inc. v. Destival*, 537 N.W.2d 687, 691 (Iowa 1995). Protected "property interests 'are created and their dimensions are defined' not by the Constitution but by an independent source such as state law." *Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 718 (8th Cir. 1995) (quoting *Craft v. Wipf*, 836 F.2d 412, 416 (8th Cir. 1987)); *see also Simonson v. Iowa State Univ.*, 603 N.W.2d 557, 562 (Iowa 1999) ("A property interest typically arises from contractual or statutory limitations

on the employer's ability to terminate an employee or can also be created by implied contract, arising out of customs, practices, and de facto policies."). The claimed property interest must be "premised on more than a unilateral expectation of ownership in the property." *Notelzah*, 537 N.W.2d at 691.

A statute "can create a constitutionally protected property interest, first, when it contains particularized substantive standards that guide a decision maker and, second, when it limits the decision maker's discretion by using mandatory language (both requirements are necessary)." *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). The statute must limit the decision-maker's discretion such that the statute "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462, 109 S. Ct. 1904, 1909 (1989). Where the relevant statutory scheme "places no substantive limitations on the discretion" of the decision-maker there is no constitutionally "protected property interest." *Movers Warehouse*, 71 F.3d at 720.

The statute at issue here does not provide particularized substantive standards or limit the Governor's discretion in setting Godfrey's salary but instead provides the Governor with unfettered discretion. The statute provides:

> The governor shall establish a salary for appointed nonelected persons in the executive branch of state government holding a position enumerated in the section of this division of this Act that addresses the salary ranges of state officers within the range provided, by considering, among other items, the experience of the individual in the position, changes in the duties of the position, the incumbent's performance of assigned duties, and subordinates' salaries.

2008 Iowa Acts ch. 1191, § 13. The statute provides only that the governor "shall establish a salary" within a particular salary range. *Id.* The statute

does not require an increase nor does it prohibit a decrease. The statute provides the governor may consider certain items in establishing the appointed officer's salary, but the list of items is nonexhaustive and allows the governor to consider any "other items." *Id.* The statute does not identify any criteria for setting a particular salary, does not specify the weight given to or importance of any item, and does not provide a grounds for review. *See id.* The balancing of any "other items" is wholly at the governor's discretion.

To appreciate the discretion afforded under the statute, consider the facts of this case. Candidate and Governor Branstad heard repeated complaints regarding the commissioner's anti-employer bias from ABI, the Iowa Motor Truck Association, self-insured companies, lawyers representing self-insured companies, BPI (a large meat processor), and other businesses. The plaintiff tried to prove his performance as commissioner was excellent and these complaints and perceptions were unfounded. The plaintiff spent many days of trial having witnesses parse through workers' compensation cases decided during Godfrey's term and opine on whether the cases were rightly or wrongly decided and whether the cases were claimant- or employer-oriented. None of this evidence was relevant because it was undisputed that these industry associations, lawyers, and businesses did, in fact, voice complaints, whether founded or not, about the workers' compensation commission under Godfrey's leadership. Under the statute, the Governor was entitled to consider industry's perception of the workers' compensation system under Godfrey's leadership, whether correct or not, and how that perception would impact Iowa's economy. Further, under the statute, the Governor was entitled to make that consideration the single most important item in setting the commissioner's salary within the statutory range.

Notably, Godfrey did not claim a violation of the salary statute *per se*. Rather, he alleged his constitutional rights had been violated. The threshold for proving a constitutional violation based on an alleged violation of a statute is higher than that for proving a violation of the statute. *See Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 568 (Iowa 2019) (explaining that a statutory violation does not automatically convert to a due process violation).

A salary statute, like the one at issue here, that does not prohibit a salary reduction and that vests the decision-maker with discretion is insufficiently concrete to create a constitutionally protected interest in a particular salary. *See McKinney v. Univ. of Pittsburgh*, 915 F.3d 956, 961 (3d Cir. 2019) (stating when there is ambiguity as to whether an employee's salary can be reduced, there is no property interest in the salary and citing cases); *McLemore v. City of Trenton*, No. 05–4631FLW, 2007 WL 2112341, at *5 (D.N.J. July 19, 2007) ("Clearly, substantive due process is not implicated in this case. Plaintiff has failed to show how an alleged deprivation of a salary increase amounts to a fundamental right under the Constitution."); *Anderson v. Colo. State Dep't of Pers.*, 756 P.2d 969, 976 (Colo. 1988) (en banc) ("The hearing examiners have not cited any decision of any jurisdiction supporting the proposition that public employees have a general property right to receipt of a particular salary."); *Scutt v. LaSalle Cnty. Bd.*, 423 N.E.2d 213, 217–18 (Ill. App. Ct. 1981) ("Under the settled law in this state, a public employee has no property interest in the continuation of any specific rate or method of compensation. . . . With no constitutional right to employment nor property interest in the continuation of a rate of compensation, we find no due process denial here present."); *Warren Cnty. Vocational–Tech. Sch. Educ. Ass'n v. Warren Cnty. Vocational–Tech. Sch. Bd. of Educ.*, 726 A.2d 939, 942 (N.J. Super. Ct. App.

Div. 1999) (holding the right to a certain salary level for a public employee is not a protected property right and thus cannot form the basis for a due process claim where the decision-maker possessed unfettered authority to set the salary).

Our conclusion that Godfrey has no property interest in a particular salary is bolstered by a further consideration. Godfrey is not an employee of the State of Iowa; he is an appointed officer of the State of Iowa. This court has long held that public officers of the state have no property interest in their compensation:

> A public office has in it no element of property, but it is rather a personal public trust, created for the benefit of the state, and not for the benefit of the individual citizens thereof. Nor are the prospective emoluments of a public office property in any sense, for the salary or other perquisites may be reduced or otherwise regulated by law at all times, unless such change is forbidden by the Constitution.

*Clark v. Herring*, 221 Iowa 1224, 1230, 260 N.W. 436, 439 (1935) (quoting *Shaw v. City Council of Marshalltown*, 131 Iowa 128, 134, 104 N.W. 1121, 1124 (1905)). In *Clark v. Herring*, we explained even where there are restrictions that may "forbid the legislature from abolishing a public office or diminishing the salary thereof during the term of the incumbent," those restrictions do not "change its character or make it property." *Id.* (quoting *Taylor v. Beckham*, 178 U.S. 548, 577, 20 S. Ct. 890, 900–01 (1900)). "In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right." *Id.* at 1231, 260 N.W. at 439 (quoting *Taylor*, 178 U.S. at 577, 20 S. Ct. at 901).

We also reject Godfrey's contention that he had a constitutionally cognizable property interest in having the Governor set his salary according to a particular process. While a plaintiff may have a protected property interest in a thing protected by a particular statute or statutory

regime, a plaintiff has no protected property interest in the procedure itself. Justice Souter explained the distinction in *Town of Castle Rock v. Gonzales*:

> But Gonzales claims a property interest in a state-mandated process in and of itself. This argument is at odds with the rule that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S. Ct. 1741, 75 L.Ed.2d 813 (1983); *see also Doe v. District of Columbia*, 93 F.3d 861, 868 (C.A.D.C. 1996) (*per curiam*); *Doe v. Milwaukee County*, 903 F.2d 499, 502–03 (C.A.7 1990). In putting to rest the notion that the scope of an otherwise discernible property interest could be limited by related state-law procedures, this Court observed that "[t]he categories of substance and procedure are distinct . . . . 'Property' cannot be defined by the procedures provided for its deprivation." *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L.Ed.2d 494 (1985). Just as a State cannot diminish a property right, once conferred, by attaching less than generous procedure to its deprivation, *ibid.*, neither does a State create a property right merely by ordaining beneficial procedure unconnected to some articulable substantive guarantee. This is not to say that state rules of executive procedure may not provide significant reasons to infer an articulable property right meant to be protected; but it is to say that we have not identified property with procedure as such. State rules of executive procedure, however important, may be nothing more than rules of executive procedure.

545 U.S. 748, 771–72, 125 S. Ct. 2796, 2812 (2005) (Souter, J., concurring) (alterations and omission in original).

Godfrey has no procedural or substantive due process right under the Iowa Constitution in continuing his salary at a particular level or in having his salary set within a statutory range according to a particular process. Godfrey's claim thus fails as a matter of law. *See Gray v. Bd. of Regents of the Univ. Sys.*, 150 F.3d 1347, 1350 (11th Cir. 1998) ("The success of due process arguments depends upon the finding of a constitutionally protected property interest in the expectation of continued

employment or of a liberty interest having been infringed upon by the State; absent such interest, no due process protections attach.").

V.

For these reasons, we conclude the defendants are entitled to judgment as a matter of law with respect to all claims. We reverse the judgment of the district court and remand this matter for the entry of dismissal of the plaintiff's claims.

**REVERSED AND REMANDED.**

Waterman, Mansfield, and Oxley, JJ., join this opinion. Appel, J., files an opinion concurring in part and dissenting in part. McDermott, J., files an opinion concurring in part and dissenting in part, in which Christensen, C.J., joins.

**APPEL, Justice (concurring in part and dissenting in part).**

### I. Introduction.

At the outset, it is important to point out what this case is about and not about.

First, the case is not about whether the court believes the testimony of any particular witness who testified at trial. Instead, it is about the respective roles of the jury and a reviewing court. Determining whom to believe is a classic function for the jury. *See Est. of Todd v. Todd*, 585 N.W.2d 273, 278 (Iowa 1998) (holding that when an action is tried at law, and in front of a jury, the court is "in no position to weigh the evidence as if the case were on de novo review"); *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) ("Our task is not to weigh the evidence or the credibility of the witnesses."). Under Iowa law, this court is required to permit the jury to completely disregard the testimony of witnesses which, given the verdict, they apparently did. *See Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 551 (Iowa 2018) ("The jury is free to disbelieve [a witness's] testimony . . . ."); *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive."); *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992) ("Assessment of a witness's credibility is uniquely within a lay jury's common understanding.").

Second, the question is also not whether there was substantial evidence in the record to suggest that factors other than sexual orientation or retaliatory motive were at work in the decision to reduce Godfrey's salary and to engage in other actions related to Godfrey. In other words, there

was substantial evidence in the record which would have permitted the jury to return a verdict in favor of the defendants.

But it is up to the jury to decide whether to credit the defendant's defense or the plaintiff's claims based on the evidence presented at trial. As we have stated, "[i]t is not necessary in a civil case that circumstantial evidence be so clear as to exclude every other possible theory." *State v. Williams*, 179 N.W.2d 756, 760 (Iowa 1970). In most litigation, there are competing narratives, both of which are supported by at least some evidence. What weight to give to competing evidence is at the heart of the jury's role in our system of justice. *See, e.g.*, *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) ("What weight to give competing testimony is a credibility issue, one properly left to the fact-finder."); *State v. Goodson*, 958 N.W.2d 791, 801–02 (Iowa 2021) (discussing the competing narratives of defendant and victim and the jury's role in determining credibility). As noted in *McGlade v. City of Waterloo*, when considering a directed verdict, appellate review

> must not be so applied as to deprive the jury of its function to ascertain the facts upon a fair dispute in the testimony, . . . if at the conclusion of plaintiff's testimony there is enough to take the case to a jury, a defendant cannot, after introducing his evidence, claim that there is nothing for a jury to determine.

178 Iowa 11, 13, 156 N.W. 680, 681 (1916).

Of course, there are occasions where a case should not be submitted to a jury. As noted in *McGlade*,

> if the testimony offered by the party having the burden is in conflict with undisputed facts, and especially with physical facts which are a verity, or is such that under all the circumstances it cannot in the nature of things be true, or is such as that it is entirely and wholly inconsistent with any other theory than that the witnesses must have been mistaken, the trial court is justified [in directing] and it is its duty to direct a verdict for the other party.

*Id.* at 14, 156 N.W. 680. But such occasions should be rare.

Third, the precise legal questions in this case are not impacted by Governor Branstad's reelection. An election does not ratify allegedly illegal conduct of a public officer toward a third party, a notion that is only a slight variant of the doctrine that the King can do no wrong. The focus in this case must be on the facts and law surrounding the claims, and not on a process of claimed political ratification. We should keep in mind the words of Chief Justice William Rehnquist, who declared:

> The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary.

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343, 99 S. Ct. 645, 657–58 (1979) (Rehnquist, J., dissenting). "[A] key purpose behind the right of a jury trial was to protect against government encroachment upon the rights of citizens in civil . . . actions." Andrew S. Pollis, *The Death of Inference*, 55 B.C. L. Rev. 435, 440–41 (2014) [hereinafter Pollis]; *see also* Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1183 (1991) (stating that the jury's function is "to protect ordinary individuals against governmental overreaching").

Fourth, in cases under the Iowa Civil Rights Act (ICRA) there is generally no requirement that there be direct evidence of a defendant's discriminatory motive. We long ago rejected the formalism of valuing direct over indirect evidence. *State v. O'Connell*, 275 N.W.2d 197, 205 (Iowa 1979) (en banc). More recently, we have empowered our juries with a judicial exclamation point by rejecting the notion that a fact finder cannot engage in reasoning that requires a series or "stacking" of inferences. *State v. Ernst*, 954 N.W.2d 50, 58–60 (Iowa 2021). Our decision in *State v. Ernst* was a major step in reinforcing the primary fact-

finding role of the jury and restricting the role of judges in evaluating the validity of verdicts upon judicial review. *See generally* Pollis, 55 B.C. L. Rev. 435 (arguing that appellate courts have invaded the role of the jury by limiting the historic role of the jury to draw inferences from circumstantial evidence).

Fifth, the role of circumstantial evidence is particularly important in a discrimination case, where there is rarely direct evidence of motivation. *See, e.g.*, *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); *Blare v. Husky Injection Molding Sys. Bos., Inc.*, 646 N.E.2d 111, 114 (Mass. 1995) ("The ultimate question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence . . . ."). No one, or at least very few people, announce an intention to discriminate. There is a body of caselaw supporting civil rights verdicts based upon circumstantial evidence. *See, e.g.*, *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1045–48 (7th Cir. 2000); *Bodaghi v. Dep't of Nat. Res.*, 995 P.2d 288, 296, 303 (Colo. 2000) (en banc) ("[C]ircumstantial evidence is often particularly helpful when, as here, a case turns on vacillating issues such as motive or intent."); *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 895 (Iowa 1990).

Sixth, the standard of relevance for the admission of evidence generally is not a high bar. Iowa R. Evid. 5.401 ("Evidence is relevant if: *a.* It has any tendency to make a fact more or less probable than it would be without the evidence; and *b.* The fact is of consequence in determining the action."); *Smith v. Pine*, 234 Iowa 256, 265, 12 N.W.2d 236, 242 (1943) ("The test for determining its admissibility is that the offered proof must lead to a reasonable inference and not a mere suspicion of the existence of

the fact sought to be proven."); *see also Nw. Mut. Life Ins. v. Johnson*, 275 F. 757, 760 (8th Cir. 1921) ("The law is well settled that, when a plaintiff in a case has to rely solely upon circumstantial evidence that it is very liberal in admitting any evidence which will aid in establishing the facts necessary to a recovery. Evidence of this nature is always admissible to show intent."). In a civil rights case involving discriminatory motive, the courts have been generous in the admission of circumstantial evidence. *See, e.g., Iowa City Hum. Rts. Comm'n v. Roadway Express, Inc.*, 397 N.W.2d 508, 511–12 (Iowa 1986); *see also Becker v. ARCO Chem. Co.*, 207 F.3d 176, 194 n.8 (3d Cir. 2000) (citing cases holding that evidence of a defendant's prior discrimination of other employees is relevant and admissible); *Jones v. Cargill, Inc.*, 490 F. Supp. 2d 978, 985–86 (N.D. Iowa 2007) (allowing evidence of stray racist remarks by non-decision-makers).

Seventh, in considering the admissibility of circumstantial evidence, the district court under our caselaw has broad discretion. *Pine*, 234 Iowa at 265, 12 N.W.2d at 242 ("[W]ide latitude is generally allowed in admitting [circumstantial evidence] especially where direct evidence is lacking."); *Hayes v. Stunkard*, 233 Iowa 582, 590, 10 N.W.2d 19, 23 (1943) ("Great latitude should be allowed in the reception of circumstantial evidence where a party must rely on that form of evidence to prove his theory."). So, our generous evidence law is double-barreled: it establishes a low threshold for admissibility and vests the district court with broad discretion in applying that low threshold.

Eighth, the essential question on judicial review under our traditional caselaw is limited to whether the record is so devoid that the jury has no role to play in finding the facts. *Graham v. Chi. & N.W. Ry.*, 143 Iowa 604, 615, 119 N.W. 708, 711 (1909) ("This court has gone its full length to protect the right of jury trial against encroachment by the courts

under any guise, and one of the rights of jury trial is the right to have the credibility of the witness determined by the jury."), *supplemented on reh'g*, 143 Iowa 604, 122 N.W. 573. There are only very narrow exceptions. "The testimony of a witness may be so impossible and absurd and self-contradictory that it should be deemed a nullity by the court." *Id.*; *see also State ex rel. Mochnick v. Andrioli*, 216 Iowa 451, 453, 249 N.W. 379, 380 (1933) ("The rule that it is for the jury to reconcile the conflicting testimony of a witness does not apply where the only evidence in support of a controlling fact is that of a witness who so contradicts himself as to render finding of facts thereon a mere guess. We may concede that, ordinarily, contradictory statements of a witness do not make an issue of fact; and that such situation may deprive the testimony of all probative force.").

In engaging in judicial review of jury verdicts, we must remember that the tyranny that juries were designed to prevent includes "the tyranny of potential elitism or aristocratic decision making by the judicial officers of the government itself." R. Jack Ayres, Jr., *Judicial Nullification of the Right to Trial by Jury by "Evolving" Standards of Appellate Review*, 60 Baylor L. Rev. 337, 342 (2008) [hereinafter Ayres]. As noted by the United States Supreme Court, "[j]ust as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 306, 124 S. Ct. 2531, 2539 (2004). It would be an act of constitutional irony for the judicial branch to limit the scope of the fact-finding power of the very institution that was explicitly designed to control the power of the judiciary.

In conclusion, the jury is a foundational institution in our system of government. It is constitutionally established, just like the courts, the

legislature, and the chief magistrate. As a general proposition, judges should be extremely cautious before substituting their own views for that of the jury. *See State v. Paredes*, 775 N.W.2d 554, 567 (Iowa 2009) ("[A] court must be careful not to usurp the role of a jury by making credibility determinations that are outside the proper scope of the judicial role."); *State v. Sauls*, 356 N.W.2d 516, 522 (Iowa 1984) (en banc) (Carter, J., dissenting) ("Given the role of the jury in our system of justice, we must accept the ability of that institution to resolve the difficult issues of credibility which are presented."); *see also Hasham*, 200 F.3d at 1047 ("[W]e will not second-guess a jury on credibility issues. While this court's review is confined to the 'cold pages' of an appellate transcript, the jury had an opportunity to observe the verbal and non-verbal behavior of the witnesses, including the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements." (alteration in original) (quoting *United States v. Hickok*, 77 F.3d 992, 1006 (7th Cir. 1996))).

**II.  Discrimination Claim Under the Iowa Civil Rights Act.**

**A.  Introduction.**    Godfrey claims that Governor Branstad's decision to ask for his resignation and reduce his salary by 35% if he refused was "motivated in part" by Godfrey's sexual orientation. He also claims other acts of discrimination based on sexual orientation. But Governor Branstad denies that he knew anything about Godfrey's sexual orientation at the time he decided to reduce Godfrey's salary. Further, the defendants deny that any adverse action was taken against Godfrey based on his sexual orientation. In light of the lack of direct evidence of the state

of mind of the defendants, the plaintiff must prove his case, if he can, by use of circumstantial evidence.[4]

**B. Failure to Exhaust Administrative Remedies.** In order to bring claims under the ICRA, a party must first exhaust administrative remedies before the Iowa Civil Rights Commission (ICRC). *Ackelson v. Manley Toy Direct L.L.C.,* 832 N.W.2d 678, 680 n.1 (Iowa 2013) (discussing Iowa Code § 216.16(1)). The defendants claim that Godfrey failed to timely file claims with the ICRC of retaliation related to the May 2012 item veto and the reversion of unspent funds at the end of the year.

Godfrey responds that he timely filed three separate charges with the ICRC, that he is not required to file a new claim with each continuing incident, and that claims that reasonably relate to reported claims are proper. The key case cited by Godfrey is *Lynch v. City of Des Moines.* 454 N.W.2d 827, 832–33 (Iowa 1990). In *Lynch,* the question was whether the ongoing adverse actions "reasonably relate" to the administratively exhausted claims. *Id.*

Godfrey filed three complaints with the ICRC. His original August 22, 2011, complaint alleged retaliation based on the salary cut and statements to the press made shortly thereafter. His subsequent April 12, 2012, complaint asserted that the defendants retaliated against him by "discrimination, harassment, retaliation, isolation, and ostracism." The April 12 complaint specifically asserted retaliation based upon the lack of invitation to a retreat on October 11, 2011, the refusal to publish a favorable press release, and ostracism by others. His third complaint, filed

---

[4]There is a threshold question of whether the ICRA provides coverage for Godfrey as an appointed official. For the reasons expressed by the majority, I conclude that the defendants are precluded from raising the issue at this stage of the litigation by law of the case and judicial estoppel.

on December 28, 2012, again alleged, "I have continued to be subjected to discrimination, harassment, retaliation, isolation, and ostracism."

None of the three complaints specifically mentions the loss of funds through reversion or the item veto of an appropriation for a chief deputy position as retaliatory acts. The question is whether the claimed retaliation based on these budgetary matters is reasonably related to the retaliation claims made in the three complaints.

In *Hulme v. Barrett*, we considered a case where the plaintiff complained to the ICRC that she was a victim of age discrimination because her work hours were reduced. 449 N.W.2d 629, 630–31 (Iowa 1989). She was discharged from employment after she filed her complaint. *Id.* at 631. The plaintiff obtained a right to sue letter and filed an action claiming, among other things, that her firing was discriminatory and that she was discharged in retaliation for filing her complaint. *Id.* The district court held that while the plaintiff filed an administrative complaint charging that the reduction of her work hours was a discriminatory act, the plaintiff did not file a claim related to her subsequent termination and therefore did not exhaust administrative remedies. *Id.*

In *Hulme*, we reversed the district court. *Id.* at 633. We stated that "[t]o force a plaintiff to file a new administrative charge with each continuing incident of discrimination would create needless procedural barriers." *Id.* (alteration in original) (quoting *Anderson v. Block*, 807 F.2d 145 (8th Cir. 1986)). We held that the district court had jurisdiction over the claims related to termination because they reasonably related to the first claim which was properly before the court. *Id.*

In *Lynch*, we considered whether the plaintiff's original claim of hostile environment and retaliation concerning the reassignment of her patrol area was sufficient exhaustion of other acts of retaliatory conduct.

454 N.W.2d at 829–30. We held that that the other acts of retaliatory conduct were "reasonably related" to Lynch's other claims and that to require an additional administrative proceeding "would be to erect a needless procedural barrier to hearing the merits of Lynch's case." *Id.* at 833.

On this point, I agree with Godfrey. *Hulme* and *Lynch* stand for the proposition that a person claiming retaliation does not need to file a new administrative complaint with each successive act of retaliation as long as the actions are reasonably related to the underlying complaint. Although the budget matters were never specifically raised in an administrative complaint, the acts as alleged were certainly "reasonably related" as that term is used in *Hulme* and *Lynch*. *See Clockedile v. N.H. Dep't of Corr.*, 245 F.3d 1, 6 (1st Cir. 2001); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832–33 (6th Cir. 1999); *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 546–47 (6th Cir. 1991).

**C. Questions of Admissibility of Evidence on Discrimination Claim.**

1. *Introduction.* The defendants claim that Godfrey introduced evidence that was far afield from the question of whether the defendants engaged in discriminatory conduct toward Godfrey as a result of his sexual orientation. Godfrey maintains that the evidence was relevant to show discriminatory intent or animus. Most of the evidentiary challenges raise questions of relevance under Iowa Rule of Evidence 5.401 (relevancy) and admissibility under Iowa Rule of Evidence 5.403 (balancing relevancy and prejudice). One claim, however, asserts admission in violation of Iowa Rule of Evidence 5.802 (hearsay).

The standard for reviewing admission of evidence alleged to be hearsay is to correct errors at law. *Hawkins v. Grinnell Reg. Med. Ctr.*, 929

N.W.2d 261, 265 (Iowa 2019). The standard for review of admission of evidence on relevance grounds is for abuse of discretion. *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (en banc). In order to be relevant, evidence need not prove a proposition or inference but must only have a tendency to show that a particular fact is more likely than not. *See Spahr v. Kriegel*, 617 N.W.2d 914, 916 (Iowa 2000) (en banc); *see also Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009) ("[A] piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball."); *United States v. Leon-Gonzalez*, 24 F. App'x 689, 692 (9th Cir. 2001) ("Although an argument can certainly be made that the testimony may have been remote, that is an issue going to the weight of the testimony, not its admissibility."). As noted earlier, the district courts are entitled to "great latitude" in their application of the "very liberal" rule of relevancy.

2. *Discussion.* I begin with the easier issues. In my view, the evidence regarding the off-hand comment by Senator Dearden is admissible. The anecdote is offered not to show the truth of the matter asserted but merely the notion that the fact of Godfrey's sexual orientation may have swirled around the capitol rotunda and became common knowledge in political circles.

The admission of evidence regarding the reversion of funds and the Governor's item veto of an appropriation for a chief deputy to show an adverse action was not an abuse of discretion. The plaintiff is entitled to attempt to prove his case that the defendants discriminated or retaliated against him based on sexual orientation. The fact that the acts allegedly used to retaliate were within the constitutional power of the defendants does not require exclusion of evidence in a civil rights case.

The admissibility of evidence regarding positions of Governor Branstad and his supporters on issues related to sexual orientation raises a different issue. We want our judicial system to make decisions based upon facts and law and not party politics. That said, the substantive political affiliations may be germane in civil litigation under some circumstances. As noted in one case, social media posts by a politician's constituency may demonstrate the politician's intent to engage in a particular act. *Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006–08 (11th Cir. 2018) (holding that district court did not abuse its discretion in allowing evidence of social media statements made by private individuals used to determine intent of public officials).

The essential problem in this type of case is that direct evidence of intent to discriminate is almost never available. *See, e.g., Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1100 (9th Cir. 2005) ("Employment discrimination cases inevitably present difficult problems of proof, precisely because we cannot peer into the minds of decision-makers to determine their true motivations."); *Arteaga v. Brink's, Inc.*, 77 Cal. Rptr. 3d 654, 666 (Ct. App. 2008) (noting that "smoking gun" evidence of discrimination is rarely found). It certainly was not available in this case. As a result, in my view, parties seeking to show intentional discrimination should have some leeway in offering evidence to make the case. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("True, some cases permit easy inferences, such as the fabled employer who admits to firing an employee because of race. But even then fact finders must ask themselves what the admission means. Few discrimination cases are so straightforward—indeed they are often factually complex and require sifting through ambiguous pieces of evidence. And the direct-and-indirect framework does nothing to simplify the analysis."); *Becker,* 207 F.3d at

194 n.8 (citing cases holding that evidence of a defendant's prior discrimination of other employees is relevant and admissible); *Roadway Express*, 397 N.W.2d at 512 ("[C]omparative employment data constitutes probative evidence from which discriminatory intent may be inferred."); Kerri Lynn Stone, *Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law*, 77 Mo. L. Rev. 149, 192–96 (2012) (arguing for liberal admissibility of stray remarks by employers); Kristin M. Bovalino, Note, *How the Effeminate Male Can Maximize His Odds of Winning Title VII Litigation*, 53 Syracuse L. Rev. 1117, 1136 (2003) ("Circumstantial evidentiary analysis is particularly useful where the reliability of direct evidence is questionable, and circumstantial evidence may sufficiently establish plaintiff's prima facie case.").

Here, the admissibility of evidence that, for example, the Republican Party of Iowa in its platform declined to support giving gay people the same right to marry as opposite sex couples does not *prove* discriminatory intent based on sexual orientation in the employment context. Many public figures, including President Barack Obama, Senator Hillary Clinton, and Governor Thomas Vilsack, have opposed gay marriage at some time in their political careers. Surely we can all agree that opposing gay marriage does not necessarily mean that one discriminates against gay people in the workplace.

But, the fact that the Republican Party sought to oppose gay marriage, gay adoption, and eliminate employment protections based on sexual orientation in its 2010 platform has at least some relevance on the cultural and political climate in which Governor Branstad operated and has some bearing on the issues in this case. Robert Belton, *Causation and Burden-Shifting Doctrines in Employment Discrimination Law Revisited: Some Thoughts on* Hopkins *and* Wards Cove, 64 Tul. L. Rev. 1359, 1387

n.179 (1990) ("Sufficiency and admissibility of evidence are two distinct issues. Evidence can be admissible but not sufficient to sustain a party's burden of proof on a particular issue.").

In my view, the evidence offered by the plaintiff related to the attitudes of the defendants and the persons and organizations involved in the decision to take action against Godfrey is admissible in this case under the low bar of relevance established in our caselaw.

As to the position of the Republican Party with respect to gay rights, there was testimony that Governor Branstad was a consummate politician, a pro's pro, as one witness stated, and a jury arguably could infer that he would have his ear to the ground on political issues affecting the Republican Party. The fact that substantial elements in the rank and file of the Republican Party sought to remove the provision of the ICRA outlawing discrimination on the basis of sexual orientation is something arguably part of the mosaic of facts that a jury was entitled to know.

On the other hand, Governor Branstad left office and was President of Des Moines University in the years prior to his election in November of 2010. He asserted that he promised to stay out of politics as President of Des Moines University. He told the jury he had never read the Republican Party platform in 2010. So his ear might have been further from the political ground than Godfrey claims. The testimony of former State Senator Matt McCoy about Republican senators in the time period between 2000 and 2008 is some distance in time and place from the events that occurred in July 2011.

The question of whether this evidence should have been admitted can be disputed. On balance, however, I cannot say it was an abuse of discretion for the district court to admit the evidence. Circumstantial cases are often put together in small pieces. The nature of the political

environment and the attitude of the Governor's political party to gay rights questions is not wholly irrelevant to a Governor who is sensitive to political atmospherics. I am not prepared to say that the district court abused its great latitude of discretion in determining that the evidence was admissible and that any prejudice arising from the evidence did not substantially outweigh the probative value of the evidence.

**D. Sufficiency of the Evidence of Adverse Action to Support Discrimination Claim.**

1. *Introduction.* A civil rights plaintiff must demonstrate that he or she has suffered "adverse action" as a result of discrimination. *Channon v. UPS, Inc.*, 629 N.W.2d 835, 861–62 (Iowa 2001). Generally, "adverse action" for purposes of making a discrimination claim requires a tangible change in terms, conditions, or benefits of employment. *See, e.g.*, *Thomas v. Corwin*, 483 F.3d 516, 528–29 (8th Cir. 2007); *Channon*, 629 N.W.2d at 862.

A question that arises in the caselaw is what is sufficiently injurious and concrete to meet the adverse action requirement for establishing a discrimination claim. For purposes of Godfrey's discrimination claim, there is no doubt that the reduction of his salary on July 11, 2011, by 35% was adverse action. The question is whether there are any other adverse actions for which the plaintiff might be entitled to a remedy through a claim of discrimination under the ICRA.

2. *Discussion.* I agree with the majority that prior to July 11 Godfrey suffered no adverse action under the ICRA for purposes of a discrimination claim. As the majority correctly points out, a spurned request for a resignation, without more, is not adverse action. After the December 29, 2010, meeting, Godfrey was permitted to continue on the job without intervention by the defendants until July 11, 2011. Thus,

during the time period up to July 11, I agree that there was no adverse action taken by the defendants against Godfrey and he has no discrimination claim as a matter of law arising during that time frame.

The situation changes, as the defendants recognize, on July 11. A day or two after his salary was reduced, Godfrey's lawyer called Brenna Findley about the Governor's action. At that point, it certainly became clear to the defendants that Godfrey was opposing conduct which he believed violated the ICRA. Further, press reports circulated making it clear to the defendants that Godfrey asserted the defendant's violated the ICRA.

In any event, after July 11, the defendants do not claim on appeal that they did not know Godfrey was making a claim of discrimination based on sexual orientation and opposed allegedly illegal acts. Apparently, either Godfrey's statements to the press or his attorney's phone call took care of that.[5] So the question arises whether Godfrey suffered adverse action after these two events for purposes of a claim of intentional discrimination.

At this point, it is important to point out the difference between adverse action for purposes of a discrimination claim and adverse action for purposes of a claim of unlawful retaliation for opposing allegedly unlawful actions. As noted above, adverse employment action for a *discrimination* claim under the Federal Civil Rights Act has generally been held to mean tangible change in employment terms, conditions, or benefits. *Thomas*, 483 F.3d at 528–29.

---

[5]Neither party specifically references the call in their briefing. But the defendants do not claim that the plaintiff failed to show opposition after July 11 regardless of the theory.

But, in 2006, in *Burlington Northern & Santa Fe Railway v. White*, the Supreme Court determined that under the Federal Civil Rights Act "the antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. 53, 64, 126 S. Ct. 2405, 2412–13 (2006). Instead, an employment action will be adverse when the action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 68, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). In light of *Burlington Northern*, we must pursue two tracks when considering whether adverse action is present in this case. Whether adverse action is present for a discrimination claim requires a showing that action has a material consequence to the employee.

Based on my review of the record, I do not find that Godfrey has established that the post-July 11 actions are sufficient to establish an independent claim of discrimination based upon sexual orientation. In the post-July 11 period, the defendants plainly knew that Godfrey was gay and that he claimed to be opposing illegal conduct. But the actions taken by the defendants in the post-July 11 period, even construed in a light most favorable to the plaintiff, do not arise to an adverse action that impacts the terms and conditions of employment. The post-July 11 events did not objectively alter Godfrey's job in any material way. His job really remained pretty much the same and he was able to carry on much as he did before. He claimed he received treatment from the director of Iowa Workforce Development that he thought was rude and micromanaging. He had budget issues, including reversion of funds that he thought he should be able to keep, and did not get an additional position for a chief deputy

after the Governor item vetoed the provision. He was not invited to a meeting with executives in the administration.

But I do not find the post-July 11 acts sufficient to give rise to a material change in terms, conditions, or benefits of the job. As a result, based on my review of the record, I conclude that the only adverse action against Godfrey with respect to a claim of discrimination based on sexual orientation was the 35% reduction of his salary on July 11. The conclusion that there was no adverse action beyond the 35% pay cut for purposes of making a discrimination claim, however, does not mean that there was no adverse action for purposes of a separate retaliation claim arising out of conduct in the post-July 11 period. That question is discussed below under the analysis of Godfrey's retaliation claim.

**E. Validity of Jury Verdict on Issue of Knowledge of Godfrey's Sexual Orientation.**

1. *Introduction.* With respect to the claims under the ICRA, a party must show that the defendant knew that a person was within a protected class. The ICRA expressly provides that "sexual orientation" is protected under the statute. But the question arises whether the defendants knew that Godfrey was gay at the time they took adverse action against him.

2. *Position of State defendants.* The State defendants assert that there is no evidence that Governor Branstad knew that Godfrey was gay at the time he made his decision to reduce his salary on July 5, 2011. Governor Branstad testified that at the time he made the decision to reduce Godfrey's salary, he was not aware of his sexual orientation. While chief of staff Jeffrey Boeyink and legal counsel Brenna Findley testified that they talked about Godfrey's sexual orientation on July 8 after Findley discovered the possibility that Godfrey was gay from a website, they

testified that they decided not to bring the matter to the attention of Governor Branstad.

3. *Position of Godfrey.* Like most civil rights cases, Godfrey has no direct evidence showing that Governor Branstad knew Godfrey was gay prior to the July 11 reduction in salary. There are no declarations by Governor Branstad or troublesome personnel records with questionable observations. But Godfrey claims that it may be inferred from circumstantial evidence that Governor Branstad must have known about Godfrey's sexual orientation when Godfrey's salary was reduced.

First, Godfrey points out matters related to sexual orientation were an important part of the Iowa political scene for some time. Godfrey points out that this court in 2009 decided *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009), three justices were not retained largely as a result of that decision, and that the question of gay rights generally figured prominently in the 2010 campaign for governor. He notes that the Republican Party, and Governor Branstad as a candidate, opposed gay marriage in very strong terms. So the broad question of the rights of persons based on sexual orientation was certainly a feature of the political environment in 2010.

Second, Godfrey points out that he had publically embraced his sexual orientation and that his sexual orientation was widely known in political circles at the time he sought confirmation. He was not confirmed in 2006 but, after serving on an interim basis, was confirmed to serve the remainder of a term in 2007. He was again before the senate in 2009 and confirmed for a full term as commissioner. During these confirmation events, Godfrey was openly gay. Thus, in political circles, Godfrey claims his sexual orientation was common knowledge.

Third, Godfrey points to evidence that three of Governor Branstad's top advisors knew about his sexual orientation prior to July 11, 2011.

Godfrey offered evidence that then Lieutenant Governor Kim Reynolds was introduced to Godfrey's partner on the floor of the senate during the confirmation process, that State Senator Bill Dotzler told defendant Boeyink that Godfrey was gay some time before racing season opened at the Newton Speedway in 2011, and that Brenna Findley claimed that she saw a website on July 8 suggesting that Godfrey might be gay when she was on the internet trying to determine Godfrey's term of office.

4. *Discussion.* When analyzing sufficiency of the evidence in discrimination cases, judges must be careful not to allow their own opinion of the facts take place of the role of the jury. *Cf.* Theresa M. Beiner, *Let the Jury Decide: The Gap Between What Judges and Reasonable People Believe Is Sexually Harassing*, 75 S. Cal. L. Rev. 791, 846 (2002) ("Courts often judge harassment incorrectly, granting summary judgment or judgment as a matter of law in questionable cases, given what social science tells about people's perceptions of harassment."); Suja A. Thomas, *Summary Judgment and the Reasonable Jury Standard: A Proxy for a Judge's Own View of the Sufficiency of the Evidence?*, 97 Judicature 222, 227 (2014) ("[J]udges may fall prey to their own opinions of evidence upon motions for summary judgment, directed verdict, and judgment as a matter of law."). As noted above, the determination of the weight of the evidence and what inferences may be drawn from the evidence is a jury function.

One of the issues in this case is the degree to which the jury may infer Governor Branstad had knowledge of Godfrey's sexual orientation because of the knowledge of others. But under some circumstances, at least, a fact finder is permitted to make such an inference. *See United States v. Marek*, 548 F.3d 147, 152–54 (1st Cir. 2008) (stating that the knowledge of an audit was widely known among circle of friends that

included defendant). And, knowledge of individuals with a close working relationship, even when contradicted by affidavits or testimony, has been held to be the basis of a permissible inference that others had the same knowledge as well. *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp. 2d 1039, 1062 (D. Or. 2013) (noting it is reasonable to infer decision-maker had knowledge when close associates had knowledge); *McCauley v. ASML US, Inc.*, 917 F. Supp. 2d 1143, 1153–54 (D. Or. 2013) (holding that there was a genuine dispute of fact regarding decision-maker's knowledge despite uncontradicted testimony that he lacked knowledge because of interaction with managers who did have knowledge); *Day v. UPS*, 829 F. Supp. 2d 969, 974 (D. Or. 2011) (same).

The majority cites a number of cases where courts have found that the circumstantial evidence was insufficient to support the inference that an actor knew an employee was a member of a protected class under civil rights statutes. A review of the cases reveals the nature of the problem.

In *Geraci v. Moody-Tottrup, Inc.*, the court held that a pregnant employee did not establish a prima facie case of pregnancy discrimination when it was *undisputed* that management made the decision to lay her off before the plaintiff herself knew she was pregnant. 82 F.3d 578, 580–82 (3d Cir. 1996). The fact that she later told six coworkers of her pregnancy but asked them to remain quiet was of no consequence. *Id.* at 580. The court decided that when it is undisputed that the decision to terminate the employee was made prior to the plaintiff herself knowing she was pregnant, there cannot possibly be an act of discrimination by the employer based on the unknown condition. *Id.* at 581. The facts in *Geraci* are thus plainly distinguishable from this case.

Another pregnancy discrimination case cited by the majority is *Prebilich-Holland v. Gaylord Entertainment Co.* 297 F.3d 438 (6th Cir.

2002). In *Prebilich-Holland*, the plaintiff who claimed pregnancy discrimination told two coworkers of her pregnancy, but no one else. *Id.* at 441. Like *Geraci*, the plaintiff offered no circumstantial evidence that the decision-maker knew the plaintiff was pregnant when the termination was initiated four days before the decision-maker learned of the plaintiff's condition. *Id.* at 444. The plaintiff admitted that there was no reason to believe that the decision-maker knew of her pregnancy at the time the decision was made to discharge her from employment. *Id.* Summary judgment in favor of the defendant was affirmed. *Id.* Because the plaintiff in *Prebilich-Holland* conceded that there was no reason to believe that the decision-maker learned of her pregnancy at the time of the decision to terminate, there were no facts from which a jury could infer knowledge.

A somewhat different scenario was presented in the unreported case of *Nealis v. Molecular Health, Inc.*, 20-P-159, 2021 WL 1811730 (Mass. App. Ct. May 6, 2021). In *Nealis*, a plaintiff claimed he was "openly gay" and "did not hide" his sexual orientation at the workplace. *Id.* at *4. But the decision-maker spent most of his time out of the Boston office where the plaintiff was employed. *Id.* Further, the company was undergoing a dramatic downsizing due to economic factors and was left with only five remaining employees in the United States. *Id.* at *5. With only five employees, there was no need for an IT officer in the company. *Id.* Summary judgment in favor of the company was affirmed. *Id.* at *7. While *Nealis* is in some ways closer to the present case than *Geraci* and *Prebilich-Holland*, the ultimate result was supported by the dramatic downsizing of the company and the utter lack of need for IT personnel.

In *Epstein v. City of New York*, a gay law enforcement officer in New York claimed he was disciplined because of his sexual orientation. No. 06 Civ. 3788(TPG), 2009 WL 2431489, at *1 (S.D.N.Y. Aug. 6, 2009). He did

not reveal his sexual orientation to anyone in the NYPD. *Id.* at *5. He asserted that he bumped into another officer at a club from time to time and that he participated in a gay festival where he was seen by other police officers. *Id.* Finally, he filed an Equal Employment Opportunity Commission (EEOC) complaint. *Id.* The decision-maker claimed he did not know that the plaintiff was gay and did not know about the EEOC complaint when the plaintiff was disciplined. *Id.* Summary judgment was granted to the defendants. *Id.* at *6. Unlike here, in *Epstein* the plaintiff kept his sexual orientation quiet. There was no evidence that management personnel close to the decision-maker and engaged in the decision-making process knew of the plaintiff's sexual orientation.

Another case cited by the majority is *Igasaki v. Illinois Department of Financial & Professional Regulation.* 988 F.3d 948 (7th Cir. 2021). In *Igasaki,* a gay employee claimed he was terminated from employment based on sexual orientation. *Id.* at 954. In footnote 5, the court noted that the plaintiff did not prove that the decision-maker knew that the plaintiff was gay. *Id.* at 959 n.5. The plaintiff asserted that "it's reasonable to believe [the decision-maker] knew because [another male colleague] was very close to her and he asked me if I was gay, and I acknowledged it to him, and because there was also personal data information that would have telegraphed to her that I was gay." *Id.* (second alteration in original). There was no evidence, however, that the employee who was "close" to the decision-maker played any role in the decision to terminate the plaintiff's employment.

In another case, *Andrade v. Lego Systems, Inc.*, the plaintiff claimed he had been terminated based on sexual orientation. 205 A.3d 807, 809 (Conn. App. Ct. 2019) (per curiam). The plaintiff admitted that the only evidence that the decision-maker knew the plaintiff was gay was a brief

conversation where the supervisor asked the plaintiff who took care of his dogs when he was at work. *Id.* at 811. The plaintiff replied that his "partner" did. *Id.* The plaintiff claimed that this exchange was sufficient to infer that the supervisor knew that he was gay. *Id.* at 816. The *Andrade* court rejected the argument as speculative. *Id.*

Similarly, in *Thomas v. Coleman Enterprises*, the only evidence offered to support knowledge of the plaintiff's sexual orientation was an ambiguous question posed to the plaintiff as to "whether she was 'still going out with Theresa.'" No. C6-99-1327, 2000 WL 385479, at *1 (Minn. Ct. App. Apr. 18, 2000). The district court concluded that a single, isolated comment was insufficient to establish knowledge of the decision-maker. *Id.* at *6.

The published employment case that seems most analogous to this case supports Godfrey. In *H.S. v. Board of Regents, Southeast Missouri State University*, a college administrator who had HIV was terminated from employment. 967 S.W.2d 665, 668–70 (Mo. Ct. App. 1998). The question arose whether the decision-maker, a recently arrived interim president, knew that the plaintiff had HIV when the interim president made the decision to terminate the plaintiff's employment. *Id.* at 670–71. The interim president denied such knowledge, as did an administrator who reported to the president and who had handled personnel matters with the plaintiff also denied such knowledge. *Id.* at 671.

The *H.S.* court affirmed a $600,000 verdict in favor of the plaintiff. *Id.* at 668, 672. On the issue of knowledge, the *H.S.* court noted that the administrator who reported to the interim president had in the past called the campus health department and spoke about the possibility that the plaintiff had HIV. *Id.* at 671–72. According to the *H.S.* court, it was reasonable to infer that if the administrator was concerned enough to call

the health department about the plaintiff's condition, the administrator would also have informed the interim president, particularly when she knew that disciplinary action was imminent. *Id.* at 671. In short, the *H.S.* court found permissible the inference by the fact finder that the administrator who had knowledge about the plaintiff's HIV symptoms must have told the interim president, even though both denied it. *Id.* The *H.S.* court further noted the interim president's own actions, including cursory investigation and extremely disproportionate discipline, make it permissible for the fact finder to infer knowledge of the plaintiff's HIV condition and that he acted upon it. *Id.* at 672. The decision in *H.S.* stands for the proposition that where an advisor to a decision-maker knows that the plaintiff is a member of a protected class, a reasonable fact finder could infer that the advisor informed the decision-maker of that fact before taking an important employment action against the plaintiff.

The cases cited by the majority do not provide a compelling body of law to be applied in this case. Here, the facts are different. The plaintiff is a public figure who has been before the Iowa Senate on three occasions as an openly gay nominee. There was evidence that he and his partner were introduced to the senators during the confirmation process. There was evidence that the Dearden misstep ("You're not gay, are you?") spread through the capitol rotunda. The fact that Godfrey was gay was no doubt magnified in the political community after this court decided *Varnum* and three justices were not retained by the voters in 2010.

There was evidence that persons in leadership of the business community who were critical of his performance in office knew that he was gay during the relevant time period. ABI board member Dennis Murdoch testified that during confirmation battles, he thought there was an "elephant in the room" when the Godfrey nomination was discussed at an

ABI meeting because it just did not make sense that some at ABI were opposing the nomination. When he asked a senior lawyer sitting next to him at a meeting what was going on, the lawyer told Murdoch that Godfrey was gay. The main lobbyist for ABI, who sought to encourage Governor Branstad to remove Godfrey, knew he was gay. Other representatives in the business community knew he was gay.

The people at Iowa Workforce Development where Godfrey worked knew was gay. He did not hide it. Iowa Workforce Development Director Theresa Wahlert knew he was gay. His colleague whose office was next to him, Iowa Labor Commissioner Michael Mauro, testified it was common knowledge that Godfrey was gay.

And there was evidence that those close to the Governor who were involved in the decision-making regarding Godfrey's employment knew he was gay. Although his testimony was not always clear and was contradicted by another witness, Senator Dotzler testified that he told Branstad's chief of staff Boeyink that Godfrey was gay sometime in the spring of 2011. Senator Courtney testified that he introduced Godfrey and his partner to then Senator Reynolds during the confirmation battles prior to 2010. Brenna Findley testified that she discovered Godfrey might be gay on July 8, 2011, when she was searching on the internet to find out the length of Godfrey's term when the information "popped up" on the screen. Findley, as the Governor's lawyer, testified that she told Boeyink of the discovery, but decided not to tell the Governor.

So the question is, given the record in this case, should this court permit the jury to infer from the evidence that Governor Branstad knew Godfrey was gay when he made the decision to slash Godfrey's salary. Or, should this court, on appeal, refuse to permit the jury to engage in its classic fact-finding function.

It must be emphasized, in the strongest way possible, that the question is not who *we* believe. It is whether the jury has acted within the boundaries of its broad authority. The issue is sometimes framed as whether the evidence was "too speculative" to support the verdict or whether the jury has made permissible inferences, and even inferences upon inferences, based on the evidence.

In making this judgment, we must recognize that there is rarely overwhelming proof of knowledge or intent. And, the burden in a civil case is not whether there is mathematical proof of what the defendants knew, but is instead whether the jury, a storied institution which occupies an exalted place in our legal system, must be told by this court that its collective judgment, that it is more likely than not that the defendants knew that Godfrey was gay, cannot be permitted. Judges who have studied a case for a few hours or a few days risk invading the province of the jury when they tell jurors, based on our elite legal training, the diplomas on our walls, our insightful perspectives on human relations, and our general wisdom, that they will not be permitted to determine what inferences may be drawn from the evidence. My sense of judicial restraint and respect for the role of the jury prevents me from taking this issue away from the jury in this case.

**F. Validity of Jury Verdict on Question of Discriminatory Intent.** The defendants in the alternative assert that even if Governor Branstad knew that Godfrey was gay, Godfrey failed to show evidence of discriminatory intent on the part of the defendants. The parties in their briefing cite no authorities, but simply argue that the facts either support, or do not support, the proposition of antigay animus.

I would not decide this important and delicate question without supplemental briefing from the parties. Although the issue has likely been preserved by the one-page long discussion in the defendants' appellate brief, no caselaw at all has been cited by either party on the question. A number of issues and subissues lurk behind the question of whether the jury's determination of intent should be affirmed or reversed on appeal. The parties do not tell us what the proper framework of analysis is for the consideration of the question of whether the plaintiff has carried the day in proving discriminatory intent in the context of a motion for a directed verdict or motion for a judgment notwithstanding the verdict. They do not provide us with the standard of appellate review and how that should be applied to the evidence in this case. Are there nuances there to be considered? For instance, have we drifted away from older cases showing great deference to jury verdicts? *See generally* Ayres, 60 Baylor L. Rev. 337 (asserting that in Texas, and elsewhere, traditional deference to jury verdicts by appellate courts has eroded); William V. Dorsaneo, III, *Judges, Juries, and Reviewing Courts*, 53 SMU L. Rev. 1497 (2000) (discussing the standard and scope of appellate evidentiary review of findings of fact made by juries). If so, should we retreat from recent developments suggesting more aggressive judicial review of jury determinations?

Or, how does a court draw the line between rational inference and speculation? May a jury reasonably draw an inference of discrimination based on a showing of pretext alone, or must something more be shown in order for the plaintiff to carry the burden of proof on the animus issue? Should this case be analyzed as a mixed-motive case and, if so, does that impact the reasonable inferences that a jury may draw from the evidence? Or, must an employee in a mixed-motive case show some direct evidence of animus under certain circumstances and, if so, what are those

circumstances? Or, if the jury disbelieves a witness, can it engage in the antithesis inference, namely, that a witness who does not tell the truth proves the opposite, a proposition supported by advocates like Judge Jerome Frank but rejected by the Supreme Court in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986). *See* Pollis, 55 B.C. L. Rev. at 462–66, 479–83 (arguing that when state of mind is an issue it is exclusively within the domain of the jury to determine based on the evidence, including demeanor evidence). And, if we reject the antithesis inference as sole evidence, may it be applied when a party has offered some evidence in support of its position?

And, there are questions of a more general nature. For instance, what does the state and federal caselaw look like on the question of whether a jury may reasonably draw an inference of discrimination from circumstantial evidence? Surely there are some authorities to provide at least some guidance? Or, what tools are available for a reviewing court to determine when inferences of discriminatory intent has become too attenuated to support a jury verdict?

Further, is Iowa law more or less protective of jury verdicts than the federal cases or cases from other states? For instance, does the recent decision in *Ernst,* 954 N.W.2d at 58–59, rejecting a "stacking of inference" challenge to a jury verdict, have any implications here? *See generally* Pollis, 55 B.C. L. Rev. 435 (discussing the traditional role of inference in jury verdicts and its decline in the appellate courts).

In my view, the parties have simply not provided enough meaningful caselaw and analysis to guide this court on the issue of whether the jury verdict in this case on discriminatory intent should be rejected by this court on appeal. The question, of course, was hard-fought and highly contested at trial. Before resolving it, I would direct the parties to file

supplemental briefs citing relevant legal authorities and provide at least some insight into the proper approach to review jury verdicts where the defendant's mental state is at issue. *See In re Det. of Matlock*, 860 N.W.2d 898, 912 (Iowa 2015) (Zager, J., concurring in part and dissenting in part) (noting the court's prior usage of supplemental briefing); *State v. Lyle*, 854 N.W.2d 378, 383 (Iowa 2014) (noting that supplemental briefing had been ordered prior to disposition); *Nguyen v. State*, No. 11–0549, 2013 WL 1170326, at *1 (Iowa Mar. 22, 2013) (per curiam) (same); *Feld v. Borkowski*, 790 N.W.2d 72, 84 (Iowa 2010) (Appel, J., concurring in part and dissenting in part) (noting option of supplemental briefing); *State v. Reyes*, 744 N.W.2d 95, 99 (Iowa 2008) (same); *see also Trest v. Cain*, 522 U.S. 87, 92, 118 S. Ct. 478, 481 (1997) (holding that supplemental briefing is not always required when disposing a case on an issue not argued but that requesting it is "often fairer" to the parties); Adam A. Milani & Michael R. Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 Tenn. L. Rev. 245, 303–04 (2002) (suggesting that requests for supplemental briefs are consistent with judicial neutrality and the adversarial system).

### III. Retaliation Claim Under the ICRA.

**A. Introduction.** In the alternative to his claim of discrimination under Iowa Code section 216.6 (2011), Godfrey advances a separate claim for retaliation under Iowa Code section 216.11(2). A claim of retaliation requires that the plaintiff show that he or she engaged in protected activity under the ICRA, the employer made an adverse employment action against the employee, and there is a causal connection between the employee engaging in the protected activity and the adverse employment action. *See Boyle v. Alum–Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006). In addition, it has generally been held that the asserted claim or opposition must be

made in good faith to give rise to a retaliation claim. *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (lst Cir. 2009) (rejecting retaliation claim where plaintiff did not have good-faith basis for underlying claim).

1. *Adverse action for retaliation claims under* Burlington Northern. As noted above, adverse action for purposes of a retaliation claim is different than adverse action for purposes of a claim of discrimination under federal law. For a retaliation claim, the plaintiff must simply show that the action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415 (quoting *Rochon*, 438 F.3d at 1219). The federal standard for showing an adverse action for purposes of retaliation is less demanding than the standard for asserting a disparate treatment claim. *Arizanovska v. Wal–mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (noting broad scope of retaliation claim). As a result, it is not unusual for an action to meet the retaliation standard but not the disparate treatment standard. *See, e.g.*, *Martinelli v. Penn Millers Ins.*, 269 F. App'x 226, 230 (3d Cir. 2008) (observing that for purposes of a retaliation claim, workplace harassment does not need to be severe or pervasive as required to support a claim of discrimination); *Powell v. Lockhart*, 629 F. Supp. 2d 23, 41–42 (D.D.C. 2009) (holding that placing employee on performance improvement plan was insufficient to support disparate treatment claim, but could support retaliation claim because of lesser standards).

It is important to emphasize the *Burlington Northern* principle that a retaliation claim does not require that the employer's action affect the terms or condition of employment. Some inhospitable federal caselaw dealing with retaliation drifts into requiring impact on terms and conditions of employment. *See, e.g.*, *Kelleher v. Wal–Mart Stores*, Inc., 817 F.3d 624, 633 (8th Cir. 2016) ("An adverse employment action in the

retaliation context is similar to an adverse action under the discrimination standard, and '[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not.'" (alteration in original) (quoting *Spears v. Mo. Dep't of Corr. & Hum. Res.*, 210 F.3d 850, 853 (8th Cir. 2000))); *Scaife v. U.S. Dep't of Veterans Affs.*, 504 F. Supp. 3d 893, 909–10 (S.D. Ind. 2020) (analyzing materially adverse action for the purposes of retaliation as whether the action affects terms or conditions of employment); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 131–34 (D.D.C. 2010) (describing the different standards under discrimination and retaliation but proceeding to analyze retaliatory conduct as whether the action was adverse based on its effect on terms or conditions of employment). In considering a retaliation claim, it is important that courts recognize the broader standard established by *Burlington Northern.*

The federal test for "material adverse action" is generally fact-bound. As the Supreme Court has made clear, retaliation claims are "not reducible to a comprehensive set of clear rules." *Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 175, 131 S. Ct. 863, 868 (2011). As noted in *Burlington Northern,* "the standard [is phrased] in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." 548 U.S. at 69, 126 S. Ct. at 2415. As a result, categorical exclusions of certain types of employer behavior as being insufficient to support a retaliation claim is inappropriate. *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (lst Cir. 2010) (stating denial of a request for office space cannot categorically be

excluded as supporting a retaliation claim, but rather depends on facts and circumstances).

Because of its contextual nature, "[w]hether a particular adverse action satisfies the materiality threshold is generally a jury question" in retaliation cases. *Rattigan v. Holder*, 643 F.3d 975, 986–89 (D.C. Cir. 2011), *vacated*, No. 10–5014, 2011 WL 4101538 (D.C. Cir. Sept. 13, 2011). A court reviewing a jury verdict on a retaliation claim must make all inferences in favor of the plaintiff in reviewing the evidence. *Pedicini v. United States*, 480 F. Supp. 2d 438, 450 (D. Mass. 2007).

In *Burlington Northern*, the Supreme Court observed that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67, 126 S. Ct. at 2414. But the "injury or harm" in *Burlington Northern* includes insisting that a complainant "spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id.* at 71, 126 S. Ct. at 2416. And, in *Burlington Northern*, the Court emphasized that adverse action in the context of retaliation means action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57, 126 S. Ct. at 2409. As noted by then Judge Gorsuch in *Williams v. W.D. Sports, N.M., Inc.*, the 10th Circuit declared that in a retaliation case there is no absolute requirement that a retaliation claimant "must prove some tangible, subjective psychological or monetary injury" if the retaliatory action is "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." 497 F.3d 1079, 1090 (10th Cir. 2007) (emphasis omitted) (second quoting *Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415). The "harm or injury" language in *Burlington Northern* thus is not a separate or additional requirement

beyond the mandate that the action well might dissuade a reasonable worker from opposing an unlawful practice.

2. *Opposition to unlawful discriminatory conduct.* Generally, for the purposes of retaliation under the ICRA, protected activity means the filing of an action to enforce one's rights under the statute, but the statute also makes it a protected activity for a person to lawfully oppose any practice forbidden by the ICRA. Iowa Code § 216.11(2).

In order to support a retaliation claim for opposing a practice, the federal caselaw suggests that it is not enough to simply complain about an employer's action. For example, a complaint about the failure to get a pay raise or promotion, without more, is not enough. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028–29 (8th Cir. 2002); *see also Fantini*, 557 F.3d at 32 (stating that a complaint about conflict of interest does not amount to opposition under civil rights laws); *Jones v. UPS, Inc.*, 502 F.3d 1176, 1195 (10th Cir. 2007) (holding that remarks by employee must put employer on notice of opposition); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995) (holding that letter generally expressing dissatisfaction that another employee was given the job was not opposition). But there is no particular required method for voicing opposition. Calling public attention to a situation is enough. *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir. 1983). A phone call or letter from the employee's attorney claiming discriminatory conduct is sufficient. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001). And, of course, filing a complaint is opposition to the alleged unlawful practice. *Crawford v. Metro. Gov't*, 555 U.S. 271, 277, 129 S. Ct. 846, 851 (2009).

3. *State vs. federal law.* The defendants cite the Title VII *Burlington Northern* case as establishing the standard for retaliation claims under the

ICRA. Godfrey does not challenge application of the federal standard under the ICRA. Under the circumstances, we apply the *Burlington Northern* standard in this case, reserving the right to apply that standard differently than the federal caselaw. *See Pippen v. State*, 854 N.W.2d 1, 32 (Iowa 2014). It is important to note, however, that the Supreme Court's approach to Title VII is often based on constructs without explicit textual support. For example, Title VII does not expressly provide for a "material adverse action" requirement for retaliation claims. There is no requirement that we adopt such constructs in our interpretation of state law. *See Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 605–15 (Iowa 2017) (Appel, J., concurring in part and dissenting in part). *See generally* Alex B. Long, *"If the Train Should Jump the Track . . .": Divergent Interpretations of State and Federal Employment Discrimination Statutes*, 40 Ga. L. Rev. 469 (2006) (discussing judicial federalism in the context of employment discrimination statutes).[6]

4. *Importance of retaliation claims in enforcement of civil rights law.* In considering issues related to retaliation claims, we should recognize that they are not second-class claims under the ICRA. Retaliation claims are a necessary component of the statutory scheme to empower employees to oppose illegal conduct without fear of reprisal. *See Haskenhoff*, 897 N.W.2d at 626. And, as always, in interpreting the ICRA, we must bear in mind the legislative admonition that the ICRA "shall be construed broadly to effectuate its purposes." Iowa Code § 216.18(1); *see also Haskenhoff*, 897 N.W. 2d at 607–08.

---

[6]Godfrey makes no claim in this case that we should develop a different test than "material adverse impact" for retaliation claims.

**B. Discussion of Merits.**

1. *Events prior to reduction in pay.* The majority asserts that under the opposition clause, "protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. UPS, Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam). Further, the majority says that "Godfrey's mere refusal to resign, without more, does not constitute protected activity." *See Ideyi v. State Univ. of N.Y. Downstate Med. Ctr.*, No. 09–CV–1490 (ENV)(RML), 2010 WL 3938411, at *6 (E.D.N.Y. Sept. 30, 2010). Finally, the majority decides that defendants are entitled to judgment as a matter of law because there is an "absence of evidence that the basis for refusal is grounded in opposition to an alleged discriminatory action."

I agree with the majority that in order to be protected activity, the employer generally must know that the employee is opposing an illegal practice. In some cases, of course, such as sexual harassment, resistance may obviously amount to opposition to unlawful misconduct and no explicit announcement required. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000); *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002). *See generally* Matthew W. Green, Jr., *Express Yourself: Striking a Balance Between Silence and Active, Purposive Opposition Under Title VII's Anti-Retaliation Provision*, 28 Hofstra Lab. & Emp. L.J. 107 (2010) (discussing different interpretations of the opposition clause). But here, Godfrey's mere refusal to resign without comment is not sufficient to put the employer on notice that he is engaging in "protected activity." *See, e.g., Brown*, 406 F. App'x at 840; *Jones*, 502 F.3d at 1195; *Hunt*, 282 F.3d at 1028–29. Since the refusal to resign in this case is not protected

activity, I agree with the majority holding that the reduction in pay on July 11 cannot be the basis of a retaliation claim under the ICRA.[7]

2. *Events after reduction in pay.* But Godfrey also asserts that the actions taken against him *after* July 11 were also retaliatory. Godfrey cites a number of events, including Governor Branstad's comments on July 12 in the media implying that Godfrey was responsible for dramatically increasing costs of workers compensation insurance premiums and that the position required someone who could be "more fair,"[8] his exclusion from a retreat of top state executives in October,[9] micromanagement of his budget by Iowa Workforce Development,[10] the reversion of left over funds at the end of the year contrary to past practices, an item veto of an appropriation for a chief deputy, the refusal to release a press release after Godfrey was elected to a prestigious national position, and the failure to receive a performance evaluation.

The fighting issue with respect to post-July 11 events is whether a jury could reasonably conclude that the above events, either individually

---

[7]Jury Instruction Nos. 20 and 24 in this case permitted the jury to find protected activity based solely on Godfrey's good-faith belief that the request for his resignation was discriminatory. But a plaintiff's good-faith belief that an unlawful practice has occurred, though necessary to a retaliation claim, is not sufficient. The defendant must be on notice of opposition. *See EEOC v. Allstate Ins.*, 778 F.3d 444, 452 (3d Cir. 2015); *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 135 (3d Cir. 2006); *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 289 (Iowa 2000) (en banc). Because the jury instructions permitted the jury to find opposition based solely on Godfrey's good-faith belief that unlawful conduct was occurring, they were erroneous. *See Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892 (Iowa 2015) (holding prejudicial error will occur when a "district court materially misstates the law" or when the instructions mislead the jury).

[8]Godfrey's successor, Joseph Cortese, testified that to accuse a Workers' Compensation Commissioner in the exercise of his quasi-judicial duties as not being fair amounts to a serious character attack.

[9]Iowa Labor Commissioner Michael Mauro testified that attendance at the retreat was important to any administrator who managed a budget.

[10]Kelly Taylor testified that the micromanagement of Godfrey's budget exceeded that of other divisions under Iowa Work Force Development.

or cumulatively, amounted to adverse action under the *Burlington Northern* standard. The *Burlington Northern* standard for adverse action in the context of a retaliation claim is whether the actions "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " 548 U.S. at 68, 126 S. Ct. at 2415 (quoting *Rochon*, 438 F.3d at 1219). There is no requirement that a plaintiff show actual deterrence, but only that a reasonable person "well might" be deterred from opposing unlawful conduct.

3. *Cumulative adverse impact for retaliation claims.* In considering the post-July 11 actions, there is ample authority for the proposition that the cumulative adverse effect of multiple actions may be considered. *See Haskenhoff*, 897 N.W.2d at 641 (citing cases). In *Channon v. UPS, Inc.*, we affirmed a district court's finding of adverse action where an employee faced a combination of "ridicule, constructive demotion, and lack of support in the face of open hostility about her lawsuit." 629 N.W.2d at 865–66.

For those who like to rely on federal authorities or the "mirror" theory that the ICRA should be interpreted like Title VII, the EEOC has been unequivocal on the cumulative impact issue. As noted by the EEOC, "[a]n action need not be materially adverse standing alone, as long as the employer's retaliatory conduct, considered as a whole, would deter protected activity." EEOC, *Enforcement Guidance on Retaliation and Related Issues* § II(B)(1) (2016).[11]

And, there is a cornucopia of federal caselaw for the cumulative impact proposition. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (finding adverse action from a combination of actions

---

[11]Available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues.

by employer including assigning a higher proportion of students with absenteeism records, temporarily reducing pay, failing to notify of curriculum changes, and giving negative performance reviews, and concluding that "[s]ome of these actions, considered individually, might not amount to much" and that "[t]aken together, however, they plausibly paint a mosaic of retaliation"); *Haire v. Bd. of Supervisors*, 719 F.3d 356, 367–77 (5th Cir. 2013) ("Haire has put forth modest evidence that her job has changed, that she has been excluded from meetings, and that her pay may have been affected. Collectively, these occurrences rise to the level of a Title VII 'adverse employment action.' "); *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166–67 (D.C. Cir. 2010) (holding that it was an adverse action "perhaps alone but certainly in combination," for the employer to publish the employee's EEOC complaint to colleagues and to bury her in work); *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."); *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir. 2009) ("[I]ncidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge."); *Billings v. Town of Grafton*, 515 F.3d 39, 53–55 (lst Cir. 2008) (discussing many incidents in analysis of retaliation); *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003) ("The cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation."); *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) ("It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited

discrimination [retaliation]."); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (holding that several actions taken together constituted materially adverse action); *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 388 (S.D.N.Y. 2011) (noting that counseling memo and negative comment in performance evaluation might not be adverse action in themselves, but a jury could find them actionable when considered in combination with a notice of discipline); *Moore v. Cricket Commc'ns, Inc.*, 764 F. Supp. 2d 853, 862 n.8 (S.D. Tex. 2011) ("To hold otherwise would prevent remedies for retaliation in the form of 'death by a thousand cuts,' and would ignore the context-specific nature of the standard articulated in *Burlington Northern*."); *see also Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 1139 (Cal. 2005) ("[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries.").

A typical case is *Rodriguez-Vives v. Puerto Rico Firefighters Corps.* 743 F.3d 278 (1st Cir. 2014). In that case, the plaintiff, a "transitory firefighter," alleged that she was not permitted to accompany firefighters on calls and was subject to unpleasant and inequitable treatment in the workplace. *Id.* at 283, 285. She claimed, among other things, that she was not allowed to travel on a fire vehicle to get lunch and was assigned to cook and clean rather than perform other functions. *Id.* at 285. The First Circuit noted that some of the events may well "fall outside the scope of the anti-discrimination laws," but "[n]evertheless, cumulatively these allegations plausibly paint a picture that would allow a factfinder to find" retaliation. *Id.* (first quoting *Billings*, 515 F.3d at 54).

Of course, we are free to depart from the federal authorities in our interpretation of the ICRA. *Pippen*, 854 N.W.2d at 18, 27–30. But surely a combination of events, at some point, may substantially deter opposition

to illegal practices. In cases where the claim of adverse action for purposes of retaliation arises from multiple acts, the plaintiff may ask the jury, as he did in this case, to focus on whether the cumulative actions of the employer "well might" deter opposition to illegal practices. Finally, we must remember that the legislature has instructed us that the ICRA "shall be construed broadly to effectuate its purposes." Iowa Code § 216.18(1). A divide and conquer strategy that considers acts in isolation rather than in context flies in the face of that legislative mandate.

4. *Contours of adverse action in retaliation context.* Whether based on individual acts or cumulative conduct, there are limits, of course, to what may amount to adverse action for purposes of a retaliation claim. "[P]etty slights or minor annoyances that often take place at work and that all employees experience" will not constitute adverse action. *Burlington N.,* 548 U.S. at 68, 126 S. Ct. 2415. Sensing an opening with the "petty slights" language, unsympathetic courts may simply label incidents as "petty slights" that are simply routinely part of life in the work place and, as a result, not actionable.

But there is a contrary vein of federal cases. Some courts have emphasized that only "the most petty and trivial actions against an employee" should be considered per se not adverse, and instead that the question is best left to the jury to decide. *Crawford v. Carroll,* 529 F.3d 961, 973 n.13 (11th Cir. 2008); *see also McArdle v. Dell Prods., L.P.,* 293 F. App'x 331, 337 (5th Cir. 2008) ("Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide."). The threshold for a fact finder to consider the question of adverse action in the context of a retaliation claim has been characterized as a "relatively low bar." *Michael v. Caterpillar Fin.*

*Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). Yet, when reading some of the federal court cases, the bar often does not seem to be set very low.

Whether the bar is low or high, the authorities seem to recognize that context is important. "Something might be a 'petty slight' to one person but 'matter enormously' to another, such that it could 'deter a reasonable employee from complaining about discrimination." *Massaro v. Bd. of Educ.*, 774 F. App'x 18, 22 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 90). Highly contextual matters generally raise questions of fact. *See Haskenhoff*, 897 N.W.2d at 626–27.

In my view, "[t]he law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). The determination of whether adverse action is present is thus not a categorical in or out question. One cannot, for instance, categorically state as a matter of law that a negative job evaluation does not amount to adverse action for purposes of retaliation. Or that micromanaging is never sufficient. Or that lateral transfers that dramatically impact the individual in some special way are not sufficient.

5. *Overview of alleged post-July 11 retaliation.* In light of the principles above, I now turn to consideration of the actions claimed adverse by Godfrey after his salary was reduced on July 11.

I begin with discussion of an interview of Governor Branstad. In an interview on July 12 on a local radio station, WHO, the following dialogue occurred:

> Caller: Commissioner Godfrey is a, he is charged with administering the law, and it seems the law with respect to workplace injuries is fairly applied to both employers and employees in this state, so our worker's compensation system came about in 1913 and it's a proven compromise between business and industry and the rights of workers, um –

Governor: I'm very much aware of that. He's been an advocate for one side before he came into this position and since he got into that position, the cost of worker's comp for Iowa businesses has gone up dramatically. I think that we can find somebody that's more fair.

. . . .

Governor: Right, but the record as commissioner is what we're concerned about and that record is that the State's going in the wrong direction. I believe as Governor that I should have the ability to choose my own team that can help us attract more business and jobs and make the state more competitive.

Godfrey points out that while the Governor claimed that the cost of workers' compensation had gone up dramatically under Godfrey, that was simply not true. He offered substantial evidence at trial to support the proposition that in fact, workers' compensation premiums modestly decreased when he served as commissioner. Further, he offered evidence to suggest that the main drivers of workers' compensation insurance rates were the mix of industry in a given jurisdiction and rising medical costs. Godfrey further attacks the Governor's comment that he can find somebody who is "more fair" as retaliatory in nature. He draws our attention to his successor in office, Joseph Cortese, who testified that an attack on a commissioner as biased would be a serious matter.

The next incident advanced by Godfrey is his exclusion from the Governor's Executive Retreat, held on October 10. According to chief of staff Boeyink, the Governor's Executive Retreat was

a great opportunity to put the entire team together (beyond our cluster meetings) to discuss issues such as best practices for measuring employee performance, upcoming budget issues, health care and wellness indicatives, technology applications and consolidation, and plans for the rolling review of existing departmental regulations.

According to Godfrey, the meeting covered topics of interest to him, including matters related to administrative rule changes, human

resources matters, and budgetary matters. The retreat was also an opportunity for networking. But Godfrey, unlike the other division heads, was not invited.

Godfrey next asserts that there was micromanagement of his budget by Iowa Workforce Development Director Theresa Wahlert. Godfrey claims that Wahlert signed approval of travel requests with an observation, "Chris, I assume your organization is within budget? So I signed." Further, at times, Wahlert asked questions about expenditure of funds while traveling. Godfrey noted that Wahlert intervened in the personnel review of an administrative employee to include putting in a statement about the Governor's plan to create 200,000 jobs, something that Godfrey claimed the employee could not affect in her job. Staff testified that there was a level of scrutiny of the workers' compensation budget that was in excess of the past.

Godfrey further notes that in July 2012, he did not receive a job evaluation as division head from Governor Branstad. Godfrey claims that he lost an opportunity to get feedback on his work and to respond to the Governor's misunderstanding of his work.

Godfrey next asserts that unlawful retaliation occurred when the Governor did not publish a press release proposed by Godfrey after he was selected as a member of the prestigious National Academy of Social Insurance. The proposed press release would have generally stated that the academy is a "distinguished and interdisciplinary network of the nation's recognized experts in the field of social insurance—including the field of workers' compensation insurance programs." The press release further would have noted that Godfrey has been confirmed by a unanimous vote in the Iowa Senate in April 2010. Finally, the press release would have stated his inclusion was an honor not only for him

personally "but also for the state of Iowa which has a strong and stable workers' compensation program." Godfrey asserted he wanted the press release published "to let people know that . . . I was still doing my job despite the fact that my pay had been cut."

Finally, Godfrey expresses concern about the decision not to carry forward $171,000 in penalty and interest funds at the end of the fiscal year contrary to historic practice and the Governor's item veto of an appropriation of $153,000 for a chief deputy. As a result of not carrying forward the funds, Godfrey was required to leave more positions vacant for a longer period of time. The item veto prevented Godfrey from hiring a chief deputy to assist in the department's work, but was a relatively small part of a total appropriation for the division of $3,267,000.

6. *Discussion.* I now consider whether Godfrey has generated a jury question on his claim that the defendants engaged in adverse action in retaliation for his opposition to alleged unlawful conduct.[12]

I begin with consideration of whether the statements by Governor Branstad on WHO shortly after the pay cut could give rise to adverse action for purposes of a retaliation claim under the ICRA.

The defendants in their main brief argued on appeal that aside from the pay cut (which occurred prior to any protected activity by Godfrey), the plaintiff "failed to establish any other adverse action." In discussing "other" potential retaliation, the defendants briefly discuss the October 10, 2011, retreat, the press release that Godfrey wanted issued, and budget matters related to the reversion of funds and item veto of an appropriation

---

[12]The only issue is whether there was sufficient adverse action to support a retaliation claim. No claim has been raised challenging the sufficiency of the evidence to show causation with respect to the post-July 11 events.

to fund a new chief deputy position. The main brief of the defendants does not mention the Governor's statement on WHO.

In Godfrey's responsive brief, he responds to the defendants' arguments on appeal but asserts "[a]dditional adverse actions," including the WHO interview. In support of his retaliation claim related to the WHO interview, Godfrey cites testimony from his successor as workers' compensation commissioner that to be accused of not being fair in the exercise of quasi-judicial duties was a serious character attack.

In reply, the defendants first respond by arguing that the Governor's statements are absolutely privileged. In support of this affirmative defense, they cite *Barr v. Matteo*, 360 U.S. 564, 572–76, 79 S. Ct. 1335, 1340–42 (1959); *Ryan v. Wilson*, 231 Iowa 33, 40–53, 300 N.W. 707, 711–17 (1941); *Johnson v. Dirkswager*, 315 N.W.2d 215, 223 (Minn. 1982); and Restatement (Second) of Torts § 591 (Am. L. Inst. 1977).

Second, the defendants state, without citation to authority, that the press statements "were entwined with the proper functioning of the Executive Branch and our State's constitutional government."

Third, in a footnote, the defendants assert that Godfrey is attempting to resuscitate a liberty interest claim that was dismissed below and not appealed. According to the footnote, the retaliation claim raised by Godfrey related to the WHO interview is the functional equivalent of defamation and that defendants are absolutely immune from liability for such claims under the Iowa Tort Claims Act. Iowa Code § 669.14(4).

It is important to emphasize the narrow nature of the defendants' position. The defendants do not claim the statement on WHO was a "petty slight" and did not arise to "adverse action." Instead, in connection with the ICRA claim, the defendants asserted the defenses of privilege, vague

notions of separation of powers, and immunity. No other issues are raised on appeal.[13]

There are cases suggesting that negative public statements about an employee may be adverse action for purposes of retaliation. *See Szeinbach v. Ohio State Univ.*, 493 F. App'x 690, 694–96 (6th Cir. 2012) (holding that accusation of misconduct in academic research made in emails to journals and professors could amount to adverse action); *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (holding that statement to press that employee had stolen paychecks might dissuade reasonable police officer from making complaint); *Dixon v. Int'l Brotherhood of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) (holding that when defendant made public statements indicating plaintiff was unfit for the job and would pay a price for discrimination claim could be considered an adverse action); *Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344, 360 (D. Mass. 2013) (denying summary judgment on retaliation claim based on release of EEOC no cause letter); *see also Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015) (stating that the release of information in publically available SEC filings could "dissuade a reasonable worker from making or supporting a charge of discrimination" (alteration omitted)).

The caselaw clearly supports the notion that a public statement outside the workplace may be retaliatory. I would so hold here. Absent some kind of privilege or other affirmative defense, I think a reasonable jury could conclude that the Governor's statement well might dissuade a person from opposing an unlawful practice. The defendants do not argue

---

[13]No claim is made, for instance, that the statement was not defamatory or that Godfrey's opposition to unlawful conduct was not the cause of the statement. I express no views on these unraised issues.

otherwise, but instead assert arguments based on privilege or immunity and separation of powers.[14]

The defendants assert that the Governor's statement is absolutely privileged under *Ryan* and the Restatement (Second) of Torts. Because this claim was first raised in their reply brief, Godfrey did not have an opportunity to respond to the privilege claim.

It is not clear to me at this point whether the issue has been preserved. The citations provided in the briefs do not identify places in the record where the precise issue raised on appeal, namely, whether a common law privilege applies in the context of a retaliation claim, was presented to and decided by the trial court. The parties, of course, are more familiar with the thousands of pages of record than this court is on appeal. On this issue, which the defendants supported with legal citations, I would not find waiver based on the appellate presentation but would again seek supplemental briefs on the question of issue preservation. *See Meier v. Senecaut*, 641 N.W.2d 532, 537–38 (Iowa 2002). Specifically, did the plaintiff below preserve the question of whether the WHO interview was part of adverse action for purposes of a retaliation claim and, if so, did the defendants preserve the affirmative defense of privilege or immunity to the retaliation claim.

Further, it seems to me that given the posture on appeal, Godfrey is entitled to an opportunity to respond to the merits of the assertion of privilege. For example, is the privilege asserted qualified or absolute? This question appears to have been left open in *Ryan*. 231 Iowa at 50–53, 300 N.W. at 716–17. Chief Justice Warren, dissenting in *Barr*, urged a more limited approach. 360 U.S. at 578–86; 79 S. Ct. at 1343–47 (Warren, C.J.,

---

[14]The defendants also raise defenses in connection with Godfrey's due process property or liberty claims. These defenses are not relevant here.

dissenting). If the privilege is qualified, what implications does that have in this case?

And, isn't the issue of retaliation distinctly different than defamation, involving different elements and different defenses? If so, does that mean the privilege does not apply in this case?

Further, assuming a common law privilege, must the privilege give way to the remedial scheme provided by the ICRA for retaliation claims? Do the express liability creating provisions override any common law privilege? *See Williams v. W.D. Sports N.M., Inc.*, Civil No. 03-1195 WJ/ACT, 2005 WL 8164345, at * 9 (D.N.M. Jan. 11, 2005) (holding state common law privilege on tort actions for defamation did not bar federal or state retaliation claims); *cf. Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 851 (9th Cir. 2004) (holding state litigation privilege did not bar federal retaliation claims); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1077 (7th Cir. 1998) (holding state common law absolute litigation privilege did not bar federal civil rights claims).

The majority cites two cases in support of its conclusion that the Governor's statement to the press is not to be considered in evaluating Godfrey's retaliation claim: *Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015); and *Bain v. City of Springfield*, 678 N.E.2d 155 (Mass. 1997).

In *Marchuk*, the district court held that a defendant's counterclaims and corresponding press release made in response to a discrimination plaintiff's attraction of media attention to a lawsuit would not be considered retaliation. 100 F. Supp. 3d at 311. According to the district court, the actions occurred more than a year after employment ended when the plaintiff was employed in a different job in a different state in a different field. *Id.* Further, the district court noted that the plaintiff

breached federal rules by improperly publicizing the complaint and that the district court would not permit her to use her own breach of the federal rules to her advantage. *Id.* at 313.

This breach of rules argument is not mentioned in the briefing and thus there are no citations to the record showing that it was raised and ruled upon by the district court. And, of course, *Marchuk* is not cited on appeal by the defendants. It looks to me like Godfrey has had no opportunity to respond to the majority's argument based on the case. The *Marchuck* case is arguably distinguishable because of the circumstances of the plaintiff (different job, different state, different field) and the alleged breach of federal rules, neither of which is present here. But if there is no waiver, as I have argued above, I certainly would not make a dispositive ruling based on the uncited *Marchuk* without giving Godfrey the opportunity to respond.

The next case found by the majority but not cited by the plaintiff is *Bain.* 678 N.E.2d 155. It is hard to know precisely what the basis of *Bain*'s holding is, although the *Bain* court makes reference to a mayor's response to a press inquiry about a discrimination filing as "core political speech." *Id.* at 161. I am not aware of the concept of "core political speech" being advanced by the defendants and ruled upon below in the context of a retaliation claim, but it certainly does not appear in the defendants' appellate brief. Further, *Bain* is expressly limited to expression of political judgments "so long as they were not defamatory." *Id.* Thus, aside from preservation, if Godfrey had had an opportunity to address *Bain*, there might be a basis to distinguish the case.

In addition, there is the issue of whether the Iowa Tort Claims Act, Iowa Code section 699.14(4), which provides immunity for defamatory comments, applies to this case. The defendants in their reply brief cite

*Minor v. State*, 819 N.W.2d 383 (Iowa 2012), in support of their argument. *Minor* stands for the proposition that labeling a claim as something other than defamation does not defeat application of immunity for defamation.

The defendants cite no portion of the record showing that the issue was raised below and ruled upon by the district court. Further, if the issue was preserved, it is not clear that Iowa Code section 669.14(4) applies.[15] For starters, truth is not a defense to a retaliation claim, and whether the statement amounted to opinion is of no moment in a retaliation claim. On the other hand, unlike a retaliation claim, defamation does not require discriminatory intent. So, the claims are arguably not the functional equivalent. *Trobaugh v. Sondag*, 668 N.W.2d 577, 584–85 (Iowa 2003) (holding that a legal malpractice claim was not barred by Iowa Code section 669.14(4) because of conceivable similarity when the functional equivalence was not established); *see also Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (holding intentional infliction claim not within the scope of Iowa Code section 669.14(4)). Thus, on the merits, it is not clear that the immunity for slander or misrepresentation is applicable to a retaliation claim.

Further, there is a question of whether the ICRA waives or abrogates statutory sovereign immunity. *See Gomez-Perez v. Potter*, 553 U.S. 474, 490–91, 128 S. Ct. 1931, 1942–43 (2008) (holding that age discrimination in employment statute overrides sovereign immunity); *Lyon v. Jones*, 968 A.2d 416, 426 (Conn. 2009) (holding sovereign immunity waived by discrimination statute once commission releases jurisdiction); *Maggio v. Fla. Dep't of Lab. & Emp. Sec.*, 899 So. 2d 1074, 1081–82 (Fla. 2005)

---

[15]Iowa Code section 669.14(4) provides that claims are not permitted against the state arising out of "abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

(holding sovereign immunity does not apply to claims under civil rights statute); *Lopez v. Commonwealth*, 978 N.E.2d 67, 74 (Mass. 2012) (holding that the state has consented to suit under civil rights statutes); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008) (holding that actions brought under civil rights statute waives sovereign immunity).

As a result, I would order supplemental briefing of the inadequately briefed retaliation issues that are now emerging on appeal. First, I would request the parties address the question of issue preservation. Further, assuming any or all issues are preserved, I would require merits briefing on the preserved issues. Godfrey has not had an opportunity on appeal to respond to the assertions in the reply brief and the authorities cited in the majority opinion and I would offer him the opportunity to do so before ruling on these matters.

Finally, there is the question of separation of powers. The defendants in their brief cite no authorities on the separation of powers issue and there are no citations to the record showing that the issue was considered and ruled upon by the district court. The posture is thus strikingly similar to that in *Channon*, 629 N.W.2d 835. In *Channon*, the defendants made a half-page conclusory argument regarding evidentiary matters arising out of a lengthy multi-week trial with volumes of transcript without citations to authority or the record. *Id.* at 866. The *Channon* court held that, under the circumstances, the issue was waived. *Id.* I would apply *Channon* here and hold that the separation of powers issue is not before the court.

Although I would order supplemental briefing related to the Governor's WHO interview, and thus cannot opine on the question of whether Godfrey states a retaliatory claim with respect to the WHO

comments, I do note that the remaining incidents cited by Godfrey may be sufficient to give rise to a jury question on whether the plaintiff has suffered material adverse impact sufficient to support a retaliation claim. I now turn to these matters.

With respect to the Governor's Executive Retreat in October, there is caselaw that stands for the proposition that exclusion from meetings and events may be adverse action for purposes of retaliation claims. *Castro v. Yale Univ.*, Civil No. 3:20cv330 (JBA), 2021 WL 467026, at *11 (D. Conn. Feb. 9, 2021). The exclusion from committees and cutting of funding for professional activity have been found actionable. *Hinton v. City Coll. of N.Y.*, No. 05 Civ. 8951(GEL), 2008 WL 591802, at *28 (S.D.N.Y. Feb. 29, 2008). Other authorities note absence from meetings, usually, as in this case, in the context of other employer actions is a factor in the adverse action analysis. *See Aslin v. Univ. of Rochester*, No. 6:17-CV-06847, 2019 WL 4112130, at *9–10 (W.D.N.Y. Aug. 28, 2019) ("[E]xclusion from meetings can indeed be adverse employment action, especially in the context of other retaliatory actions."); *see also Dorriz v. District of Columbia*, 133 F. Supp. 3d 186, 197 (D.D.C. 2015) ("[E]xclusion from important meetings can constitute a materially adverse employment action."); *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 51 (D.D.C. 2015) ("[E]xcluding the plaintiff from meetings [and] denying the plaintiff's requests to participate in professional development opportunities . . . could be considered materially adverse employment actions because they have the potential to dissuade reasonable workers from making or supporting a charge of discrimination."); *Lee v. City of Corpus Christi*, 749 F. Supp. 2d 521, 541 (S.D. Tex. 2010) ("Excluding plaintiff from meetings she needed to attend in order to fulfill the obligations of her position is a more severe act of retaliation[,] . . . fact issues exist regarding whether the . . .

[exclusion] could dissuade a reasonable worker from making or supporting a charge of discrimination.").

The retreat was a fairly significant session attended by top state executives, including division heads like Godfrey. Admittedly, there was no evidence that the retreat would affect Godfrey's upward mobility or that networking with other state officials would provide Godfrey with some kind of concrete benefit. Yet, he certainly would have gathered helpful information about the budgeting process and administrative rules process that would be of value to him as a manager. And, certainly a reasonable jury could conclude that his exclusion affected his reputation and status within state government. Standing alone, the exclusion from the retreat may not be enough under some of the cases to permit a jury to find material adverse action, but it is an event that a reasonable jury would want to consider in assessing the cumulative impact of adverse actions taken by the defendants. If the WHO interview may be considered, there is more than enough to give rise to a jury question on adverse action.

With respect to micromanaging, there is authority, for instance, that the failure to say good morning, continually monitoring plaintiff at work, and review of minor scheduling issues may be actionable. *Bien-Aime v. Equity Residential*, No. 15-CV-1485 (VEC), 2017 WL 696695, at *2, *7 (S.D.N.Y. Feb. 22, 2017). So, micromanaging is not a category excluded from retaliatory conduct without considering context. Here, however, the intensity of the micromanaging was pretty thin considering there were only a few specific occasions cited over a multi-year period. But when viewed in the larger course of conduct, even trivial acts may be sufficient. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011). Whether petty slights combined with other actions amount to adverse action is ordinarily a jury question, but standing alone the

micromanagement in this case is insufficient to generate a jury question on retaliation. But it is another feature that may be used in combination.

With respect to the lack of a July 2012 performance evaluation, I do not think this counts for much in the assessment of whether the retaliatory events have reached the "critical mass" necessary to assert a retaliation claim. I find the context suggests that neither Godfrey nor the Governor would likely have benefitted from a personnel review, and there is no evidence that the lack of review had any impact on Godfrey. I do not suggest that the failure to engage in a performance evaluation can never be a materially adverse event. But it is not an adverse action in the factual context of this case and provides very little to be weighed in the balance of determining whether events cumulatively amount to adverse action. *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 73 (lst Cir. 2011) (holding that failure to provide performance review not adverse where plaintiff in any event received a pay raise).

On the question of failure to issue the press release, this action also does not weigh heavily in my assessment of whether a jury issue is presented. The press release itself not only announced Godfrey's election to a prestigious group, but also contained positive statements about the operation of the workers' compensation system in Iowa that the Governor was not likely to endorse.

Finally, there are the budget matters related to the reversion of funds and the item veto of an appropriation for a chief deputy position. The majority cites cases suggesting that where the harm is only to the public, the action is not adverse for purposes of retaliation toward an individual. There is authority for this proposition. *Taylor v. Mills*, 892 F. Supp. 2d 124, 145 (D.D.C. 2012); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 76 (D.D.C. 2007). As noted in these cases, *Burlington Northern*

requires that a plaintiff suffer "injury or harm." 548 U.S. at 67, 126 S. Ct. at 2414.

But whether there is injury or harm is determined by the resolution of the question of whether a reasonable person might well be dissuaded from making a claim. A conscientious state manager might be deterred from making a claim if he or she knew that the budget of the agency would be materially disadvantaged in response to opposition to unlawful conduct. The focus of a retaliation claim is on whether the jury reasonably concludes that a reasonable person in the plaintiff's position well might be dissuaded from pursuing a claim, not on judicial escalation of the injury or harm requirement.

I conclude that with respect to the WHO interview, I would order supplemental briefing on the questions of issue preservation and on the merits of various arguments presented in the defendants' reply brief and in the majority opinion. If the statement may be considered in the retaliation analysis, I would have no trouble concluding that Godfrey has raised a jury question on the adverse action issue. I do not definitively draw any firm conclusion on the balance of claims, but I would simply note that determining whether actions individually or cumulatively are "material" or whether a "reasonable person might be dissuaded" from opposing unlawful conduct raises the kind of delicate questions that are ordinarily for a jury.[16]

---

[16]I generally agree with the defendants that jury instructions in a retaliation case where there are multiple claims of retaliatory conduct should specify the acts claimed to be retaliatory to permit the jury to fashion damages arising from the unlawful conduct. Jury Instruction Nos. 19–21 and 35, however, were general instructions not tethered to discrete adverse actions or to specific adverse actions that cumulatively amounted to adverse action. But "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 2073 (2002); *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan* with approval). A plaintiff may claim adverse

I concede that there are cases with a more aggressive judicial intervention in the jury process, but I have a strong notion of historical fundamentalism with respect to the role of the jury in reigning in the judiciary. I recognize the wisdom of the observation that the standard for a retaliation claim should be one that "takes the courts out of the business of making fine grained determinations about how objectively reasonable workers would act in a variety of cases by assuming that most negative circumstances meet the threshold." Sandra F. Sperino, *Retaliation and the Reasonable Person*, 67 Fla. L. Rev. 2031, 2073 (2015); *see also Murphy v. Wappingers Cent. Sch. Dist.*, No. 15 CV 7460 (VB), 2018 WL 1831847, at *9 (S.D.N.Y. April 16, 2018) ("Although it is a close call, supported by little evidence aside from plaintiff's testimony, a reasonable jury could conclude [the supervisor's] actions, in the aggregate, would dissuade a worker from making a charge of discrimination; in other words, that they were materially adverse."). I further note that my approach is consistent with the legislative direction that the ICRA be interpreted broadly to effectuate its purposes. Maintaining adequate deterrence to keep the channels of opposition to unlawful conduct open is an important purpose of the ICRA.

Of course, the jury in this case was permitted to consider the impact of the 35% salary cut, an action that I have found occurred prior to any protected activity or opposition by Godfrey. Further, I have found the jury instructions flawed on the issues of protected activity and adverse impact. As a result, I would vacate the judgment on the retaliation claim and remand the case for a new trial.

---

action based on both individual and cumulative acts but the jury should be instructed separately on each theory.

**IV.  Procedural and Substantive Due Process.**

**A.  Introduction.**  Godfrey offered two due process theories, one based on procedural due process, and the other on substantive due process.  Procedural due process is rooted in Godfrey's claim of a property interest in his salary.  The substantive due process claim is based on a liberty interest in property of which the defendants irrationally or arbitrarily deprived him.  *See King v. State*, 818 N.W.2d 1, 27–28 (Iowa 2012).

**B.  Procedural Due Process.**  It is well established that a state employee who may be fired only for "just cause" has a property interest in his continued employment.  *Gilbert v. Homar*, 520 U.S. 924, 928–29, 117 S. Ct. 1807, 1811 (1997).  Similarly, a public employee who may only have his or her pay cut for just cause has a property interest in that salary level. *Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002).

It is not only "just cause" statutory provisions that give rise to property interest in the salary of a public employee.  For example, a statute prohibiting transfer to a position with a lesser salary may create a property interest.  *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931–32 (9th Cir. 2017).  In *Bellevue Public School District No. 405 v. Benson,* the court held that a demotion from principle to teacher accompanied by a loss in salary, that required a probable cause hearing, gave rise to a property interest. 707 P.2d 137, 141 (Wash. Ct. App. 1985).  In *Brady v. Gebbie*, the court held that a restriction limiting the grounds on which a salary may be reduced created a reasonable expectation that the employees will continue to receive their salaries and creates a property interest protected by due process.  859 F.2d 1543, 1548 (9th Cir. 1988).

The above cases teach that in order to establish a property interest in a salary, the statutory provision must limit the discretion of the

employer in a way that establishes an entitlement to a certain outcome. That is the nub of the matter in this case. The defendants claim that the Governor has complete discretion under the Salary Act to set salaries, at least within the range provided by the legislature, while Godfrey sees the Salary Act as restricting the range of discretion by the Governor to exclude salary action based on a "strictly partisan basis."

The Salary Act provides in relevant part that

the governor shall establish a salary for appointed nonelected persons in the executive branch of state government . . . within the range provided, by considering, among other items, the experience of the individual in the position, changes in the duties of the position, the incumbent's performance of assigned duties, and subordinates' salaries.

2008 Iowa Acts ch. 1191, § 13. The Salary Act clearly requires the governor to consider four enumerated factors in determining salary. A governor that sets a salary without considering these items violates the statute.

But the statute does not require that the salary level to be set for the new fiscal year have any particular relationship to past salary. It provides for a determination by the governor for the fiscal year. Past salary decisions are not a baseline in the statute, although the governor could consider past salary as "among other items" in considering the salary of a specific employee.

The legislature did not provide us with a clear indication of the meaning of the term "among other items." Does that mean that the governor may consider anything else he or she wishes to consider? Or, does it mean "other items" legitimately related to the employment relationship and reasonably related to compensation.

We often apply the rule of *ejusdem generis* when the legislature provides a list of items and then adds an open-ended phrase like "other

items." In other words, the open-ended phrase is usually limited by the nature of the preceding items in the laundry list. But here, the phrase "among other items" precedes the list. The case for application of *ejusdem generis* is thus less compelling. The term "other items" may be a term of differentiation and not one of connection. *Jama v. ICE*, 543 U.S. 335, 343 n.3, 125 S. Ct. 694, 701 n.3 (2005).

Yet, I doubt that "other items" means anything. If the legislature had intended for the governor to have unlimited discretion, as claimed by the defendants, it would have provided a salary range and authorized the governor to set salaries within it, period. All these extra words must do some work. It seems clear to me that the "other items" must reasonably relate to the job of the appointed official. That said, however, the discretion under the statute, if not unlimited, is very broad in two respects. First, the governor may consider other items of his or her choosing (as long as reasonably related to compensation). Second, the governor may set compensation at a level he or she chooses based on evaluation of the four statutory factors and other items. Although the governor's discretion may not be complete, it is certainly substantial. *See McDonald v. City of Saint Paul*, 679 F.3d 698, 705 (8th Cir. 2012) (holding that no property interest arises where state law leaves "considerable discretion" in the hands of the school board).

As the majority points out, the statute does not indicate how the various factors should be weighed. *Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007). And, the statute does not establish a right to a *specific* salary level upon the fulfillment of certain conditions. *Compare Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (holding that where defendants have discretion to deny zoning permit, applicant does not have property interest in zoning decision), *with*

*Fleury v. Clayton*, 847 F.2d 1229, 1231 (7th Cir. 1988) (holding that a right to a particular decision reached by applying rules to facts constitutes "property"). Thus, there is a body of caselaw that indicates that there is no property interest in mandatory procedures to be followed by the government in making a discretionary decision. In that way, the Salary Act is different from the ordinary just cause statute in the termination or antidemotion context, where if a plaintiff establishes that there is no just cause, there is one predictable and mandatory result: the termination or demotion may not occur.

So, the Salary Act can be viewed as simply establishing a process leading to a discretionary act. The cases suggest that there is no property interest in procedures. *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S. Ct. 1741, 1748 (1983); *see also Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999) ("Statutes or policies that are only procedural . . . do not create protected property interests."); *Schwartz v. Mayor's Comm. on the Judiciary*, 816 F.2d 54, 57 (2d Cir. 1987) ("The mandating of such procedures did not of itself create a property or liberty right.").

There is authority for the proposition, however, that where the statute places substantive restrictions on the discretion of the decision-maker regarding demotion, a property interest is created. *Williams v. Kentucky*, 24 F.3d 1526, 1537 (6th Cir. 1994). But this principle has been applied in the context of a binary decision of demotion, not in a statute providing for a range of outcomes based on discretionary application of various factors and other items.

It may be, of course, that the action of the Governor violated the Salary Act by considering factors outside the scope of the statute. And, it may be that in seeking to undermine the independence of the adjudicative process in workers' compensation cases and promote case outcomes more

favorable to employers, the defendants engaged in a public policy tort. But the narrow issue here is whether the plaintiff had a protected property interest in maintaining his salary where the statute established only a range based on general factors and other items to be considered by the Governor. The caselaw, though not precisely on point, generally runs against a property interest where the decision-maker, at the end of the day, retains substantial discretion to determine an outcome chosen from a range of options. Therefore, I concur with the majority that there is no property interest in Godfrey's salary to support his procedural due process claim.[17]

### C. Substantive Due Process.

1. *Introduction.* The law recognizes a distinction between procedural due process and substantive due process. Substantive due process, as its name suggests, is about the nature of the government action itself and not the procedure that has been provided. *See Rochin v. California*, 342 U.S. 165, 170–71, 72 S. Ct. 205, 208–09 (1952).

2. *Discussion.* I agree with the defendants on the substantive due process question. Obviously, this case is contentious litigation with very serious issues. But, the plaintiff has not cited and I have not found caselaw supporting the proposition that a substantive due process

---

[17]The plaintiff generically refers to due process but does not specifically raise a claim under the Iowa Constitution. There is no suggestion in the briefing that a different constitutional standard should be applied under the Iowa Constitution compared to existing federal law. "When there are parallel constitutional provisions in the federal and state constitutions and a party does not indicate the specific constitutional basis, we regard both federal and state constitutional claims as preserved." *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). Where a party does not advance a different standard under the Iowa Constitution compared to its federal counterpart, we use the federal standard but do not necessarily apply it in the same fashion as the United States Supreme Court or other federal precedent. *See State v. Harrington*, 805 N.W.2d 391, 393 n.3 (Iowa 2011); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

violation arises from disputes over the economic relationship between an employer and employee.

**V. Holding Trial in Jasper County.**

**A. Introduction.** Trial of this matter initially commenced at the historic Polk County Courthouse. At the time of trial, the courthouse was undergoing major reconstruction. Ultimately, Godfrey's lead counsel declined to appear at the courthouse for health reasons. Godfrey told the court that under the circumstances he might move for a mistrial. The district court advised that if an alternate location could not be found, "such a motion may well have significant merit." Thereafter, the defendant agreed to move the trial to Jasper County.

**B. Positions of the Parties.**

1. *State defendants.* The defendants charge that they were coerced into accepting a change in venue because of the district court's observation that a mistrial might have merit if an alternate venue were not found. They claim that they were prejudiced because they were required to present some of their key witnesses by videotape rather than live. Further, they claim additional costs associated with travel to Jasper County and the extended duration of the trial. They assert that the remedy for the improper venue is a new trial and that once remanded, the case should be tried before a different judge.

2. *Godfrey.* Godfrey maintains that a decision on a change of venue is reviewed for abuse of discretion. He asserts that the environment had dirt and particulates associated with the renovation and that his lead counsel was unable to continue to participate in the trial on orders of her pulmonologist. Godfrey notes that the defendants signed a joint motion for change of venue.

3. *Discussion.* On this issue, I conclude that Godfrey has the better position. In particular, the defense agreed to the change in venue. If they chose, they could have preserved the issue by resisting it. I see no basis to reverse on an issue that the defendants themselves did not urge at the district court level.

**VI. Conclusion.**

For the above reasons, I conclude that under applicable precedents, there is no basis for appellate court intervention to overturn the jury determination on the question of whether the defendants knew Godfrey's sexual orientation at the time of the July 11 salary reduction. Without supplemental briefing, however, I decline to address whether there is a basis for appellate intervention of the jury's determination that the defendants engaged in intentional discrimination.

On the retaliation claim, I conclude that Godfrey did not participate in protected activity by simply refusing to resign on July 11. After July 11, however, the defendants knew that Godfrey was making a claim of discrimination based on sexual orientation. I decline to decide whether defamatory statements in a press interview on WHO by the Governor may constitute adverse action for purposes of retaliation without supplemental briefing by the parties. Although I accept the notion of the cumulative impact theory of adverse action, it would be premature to decide whether the cumulative balance of retaliatory claims fail as a matter of law.

On the plaintiff's constitutional substantive and procedural due process claims, I conclude that the plaintiff's claims lack merit.

For the above reasons, I concur in part and dissent in part from the majority opinion.

**McDERMOTT, Justice (concurring in part and dissenting in part).**

The Iowa Civil Rights Act (ICRA)—the statute that Godfrey invokes to pursue his claims for employment discrimination and retaliation in this case—limits the relief it provides to "employees." Iowa Code § 216 (2011). Godfrey was a political appointee, not an "employee" as required under the ICRA. He thus lacks a cause of action for employment discrimination and retaliation under the ICRA. The majority believes this issue was resolved against the defendants in Godfrey's prior appeal, *Godfrey v. State* (*Godfrey II*), 898 N.W.2d 844 (Iowa 2017), and thus the majority delves into the sundry issues that the jury considered. In my view, *Godfrey II* did not— and indeed *could not*—resolve the question of Godfrey's eligibility for relief under the ICRA. Because Godfrey has no path to relief under the ICRA as a matter of law, I believe we need not reach the issues that the majority explores in dismissing the plaintiff's claims under the ICRA. I thus dissent from the majority's opinion as to division III.A concerning the viability of the argument on the ICRA's application, and concur only in the result of the remainder of division III dismissing the claims under the ICRA. I concur in division IV of the majority's opinion.

We start with the text of the statute. The ICRA provides a cause of action for unfair or discriminatory practices to "any applicant for employment or any employee." Iowa Code § 216.6(1)(*a*). The statute defines "employee" as "any person employed by an employer." *Id.* § 216.2(6). The State of Iowa qualifies as an "employer." *Id.* § 216.2(7). The key determination in whether Godfrey qualifies as an "employee" under the statute turns on whether the State "employs" Godfrey, or whether Godfrey's position constitutes a different relationship with the State.

Godfrey's own amended petition describes himself as an "appointed state officer." At trial, his counsel referred to his role as an appointed officer during the opening statement and closing argument, describing him as a "public official," "executive officer," "executive in the Branstad administration," "appointed official," "quasi-judicial officer," and "judicial officer." All of these descriptors are consistent with the statutory description of the workers' compensation commissioner's position as an "office" as opposed to "employment." *See* Iowa Code § 86.1 (describing the commissioner's "term of office").

Unlike employees, Godfrey as an appointed officer had no contractual employment relationship with the State. An officeholder has no property interest in the office he holds, and "[h]is right to exercise it is not based upon any contract." *Clark v. Herring*, 221 Iowa 1224, 1231, 260 N.W. 436, 440 (1935). Rather, Godfrey as workers' compensation commissioner was entitled to a statutory term of six years. Iowa Code §§ 69.4(3), .19. Had Godfrey not resigned his office, he would have continued holding the appointment until the term expired. *Id.* § 69.4(3).

Iowa's statutory employee merit system applies to all "employees of the state," but doesn't apply to "commissioners whose appointments are provided for by the Code." *Id.* § 8A.412(4), (6). Godfrey thus was exempted from the employee merit system. Similarly, as an appointed commissioner, Godfrey was protected from involuntary removal from his office by statute. *Id.* § 61.A. Iowa Code section 66.1A prohibits removal of an "appointive or elective officer" except for limited, specific grounds enunciated in the statute. *See id.* § 66.1A(1)–(7). An appointed officer thus isn't subject to merit incentives for exemplary performance (as are employees), and isn't subject to termination of employment for poor

performance apart from the narrow grounds in the removal statute (as are employees).

The legislature by statute vested the governor with the authority to establish the salaries of "appointed state officers" in the executive branch, cabined within a range set by the legislature. *See* 2008 Iowa Acts ch. 1191, §§ 13–14. This compensation method for appointed officers stands in contrast to the one prescribed for state employees. With employees, the legislature generally appropriates funds to the "salary adjustment fund" for distribution by the Iowa Department of Management to the various governmental subunits (agencies, departments, commissions, and so forth) for a particular employee's compensation setting. *Id.* §§ 15–17.

And Godfrey wasn't hired for his position in the manner an employee generally comes to be employed; he was appointed. He was nominated for the position in January 2007 by former Governor Culver. His nomination required confirmation by two-thirds of the members of the Iowa Senate. The senate confirmed him in April 2007 to fulfill the remainder of the prior workers' compensation commissioner's term. When that term ended, Governor Culver renominated Godfrey in February 2009 for the same position, which again required confirmation by two-thirds of the members of the Iowa Senate. The senate again confirmed Godfrey's nomination in March 2009.

Our prior cases involving questions about whether someone is a public officer as opposed to an employee have focused on several distinguishing features of public officers. *See, e.g.*, *State v. Pinckney*, 276 N.W.2d 433, 435–36 (Iowa 1979); *State v. Taylor*, 260 Iowa 634, 639, 144 N.W.2d 289, 292 (1966); *State v. Spaulding*, 102 Iowa 639, 640–51, 72 N.W. 288, 288–91 (1897). We have stated the factors evidencing public office, as opposed to public employment, as follows:

(1) The position must be created by the Constitution or legislature or through authority conferred by the legislature. (2) A portion of the sovereign power of government must be delegated to that position. (3) The duties and powers must be defined, directly or impliedly, by the legislature or through legislative authority. (4) The duties must be performed independently and without control of a superior power other than the law. (5) The position must have some permanency and continuity, and not be only temporary and occasional.

*Pinckney*, 276 N.W.2d at 435–36 (quoting *Taylor*, 260 Iowa at 639, 144 N.W.2d at 292).

Each factor supports a conclusion that Iowa's workers' compensation commissioner constitutes a public officer, not an employee. First, the position of workers' compensation commissioner is a creature of legislative enactment. Iowa Code § 86.1. Second, the commissioner exercises sovereign powers of government delegated by statute. *See, e.g., id.* §§ 86.13 (granting the commissioner authority to award workers' compensation benefits), .24 (making the commissioner's appeal decisions "final agency action"), .27 (vesting power in the commissioner to approve contested case settlements). Third, the legislature defined the commissioner's duties and powers by statute. *See id.* § 84A.5(5); *id.* § 85A.27; *id.* § 85B.15, *id.* § 86.8; *see also Tischer v. City of Council Bluffs*, 231 Iowa 1134, 1148, 3 N.W.2d 166, 173 (1942) (describing the commissioner's powers as "purely statutory"). Fourth, the commissioner's duties are performed independently and limited only by the law. The commissioner's appeal decisions represent "final agency action," Iowa Code § 86.24, and review of those decisions is subject to the limitations of judicial review, *id.* § 17A.19; *id.* § 86.26. Fifth, and finally, the commissioner position finds continuity and permanency in the aforementioned statutory six-year term of appointment, *id.* § 86.1, and in

the limited manner in which commissioners may be removed from office before their terms expire, *id.* § 66.1A(1)–(7).

Godfrey's appeal brief seems to dispute only the fourth factor, contending that he served under an express contract (created under the Code's workers' compensation provisions) that gave the State the right to control his work performance. Yet at trial Godfrey repeatedly asserted the opposite—that the workers' compensation commissioner necessarily *must* perform the duties of the position independent of external influence, and that his decisions were subject only to the requirements of Iowa law. The Iowa Code contains ample support for this assertion. Section 86.24 delineates the considerable powers afforded the commissioner in ruling on appeals within the agency, and closes with this sentence: "The decision of the workers' compensation commissioner is final agency action." *Id.* § 86.24(5). Godfrey further argued that the law intended for his position to be insulated from politics because of the two-year difference in terms between the commissioner (six years) and the Governor (four years). The possibility of review by the *judicial branch* under section 17A.19 doesn't mean that the commissioner's actions are under the "control of a superior power other than the law." *Taylor*, 260 Iowa at 639, 144 N.W.2d at 292. Indeed, judicial review as applied here merely addresses the final part of the factor—recognizing the limitations imposed by "the law"—to ensure parties a procedural right of appeal.

Another of our cases cited an additional feature tending to indicate a public office: a requirement to take an oath of office. *Francis v. Iowa Emp. Sec. Comm'n*, 250 Iowa 1300, 1303, 98 N.W.2d 733, 735 (1959). When a person's appointment "is provided for or required by law, which fixes their powers and duties, and they are required to take an oath and to give bonds, they are usually considered public officers" as opposed to

employees. *Spaulding*, 102 Iowa at 650, 72 N.W. at 291. This factor, too, cuts against Godfrey's argument, as the Iowa Constitution requires the commissioner to take an oath of office. *See* Iowa Const. art. XI, § 5 (requiring appointed public officials to "take an oath or affirmation to support the Constitution of the United States, and of this state, and also an oath of office").

The majority doesn't address the merits of the parties' arguments on whether the ICRA applies to Godfrey and instead simply holds Godfrey's ICRA claims are permitted under the "law of the case" and "judicial estoppel" doctrines. I suspect such a holding, relying on these doctrines as it does, might come as a surprise to the parties considering that neither party mentions either doctrine in the voluminous briefs they submitted to us. Indeed, in the 285 pages of legal briefs that the parties combined to file in this appeal, only three sentences disclose any notion that *Godfrey II* foreclosed our consideration in this appeal of whether Godfrey could pursue claims under the ICRA. After his arguments on the merits of whether the workers' compensation commissioner position qualifies as an "employee" under the ICRA, Godfrey includes one paragraph at the end suggesting that the Iowa Supreme Court already decided this issue. He quotes to a single line in the partial concurrence from *Godfrey II* that states: "I find the [ICRA] provides [an adequate] remedy here, at least with respect to Christopher J. Godfrey's claim against the State for discrimination on the basis of sexual orientation." *Godfrey II*, 898 N.W.2d at 892–93 (Cady, C.J., concurring in part and dissenting in part). Godfrey concludes that this statement "implicitly recognized Plaintiff as [an] employee entitled to the ICRA's protections." These sentences constitute the sum total of the parties' argument in their appeal briefs on whether

*Godfrey II* resolved this issue; the defendants, for their part, neither raised nor responded to such an argument in their briefs whatsoever.

Neither the *Godfrey II* opinion in full, nor even the single line pulled from it, supports the plaintiff's argument. The issue of whether the workers' compensation commissioner constitutes an "employee" under the ICRA was neither raised nor decided in *Godfrey II*. Rather, in *Godfrey II* we granted interlocutory review to address whether the equal protection and due process provisions of the Iowa Constitution were self-executing and thus provided Godfrey a direct action for damages. *Id.* at 845 (plurality opinion). In our analysis, we addressed whether the ICRA provided an adequate remedy to permit a parallel direct constitutional cause of action for claims of employment discrimination. *Id.* at 876–77. But we never analyzed, and never made any determination on, the issue the parties contest in this appeal about whether Godfrey was in fact an "employee" permitting him a right to relief under the ICRA.

We could not have done so even if we'd wanted to. The district court ruling that the plaintiff challenged on interlocutory review in *Godfrey II* took on the question presented as a motion to dismiss, and thus no factual record existed from which to make such a determination. *See Hawkeye Foodservice Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 604 (Iowa 2012) (stating that when considering a motion to dismiss, courts accept the facts alleged in the petition as true). The *Godfrey II* opinion acknowledged this directly, stating, "The district court explained that it considered the motion for summary judgment as a motion to dismiss because neither party asserted any particular facts upon which the district court should base its decision." *Godfrey II*, 898 N.W.2d at 846.

Nor did we look to any statutes describing the commissioner's duties or powers to examine whether Godfrey was an "employee" under the ICRA.

Our *Godfrey II* opinion, including its special concurrence and dissent, spanned 104 pages. Yet in all those pages, reference to any provision of Iowa Code chapter 86, which delineates the powers and duties of the commissioner, appears zero times. The law-of-the-case doctrine that the majority invokes has no application to this appeal because "the doctrine applies 'only to those questions that were properly before us for consideration and passed on' and '[a] question not passed on is not included' under the doctrine." *Bahl v. City of Asbury*, 725 N.W.2d 317, 321 (Iowa 2006) (alteration in original) (quoting *Lone Tree Cmty. Sch. Dist. v. Cnty. Bd. of Educ.*, 159 N.W.2d 522, 526 (Iowa 1968)).

The statement plucked from the partial concurrence stating that the ICRA provides "an adequate remedy" does not (and cannot) yield a conclusion that Godfrey was in fact *entitled to* that remedy, as the district court record developed for our interlocutory review in *Godfrey II* contained no basis to make such a finding. The plurality in *Godfrey II* made pains to express this limitation:

> We emphasize our holding is based solely on the legal contentions presented by the parties. We express no view on other potential defenses which may be available to the defendants and no view whatsoever on the underlying merits of the case. We hold only that the defendants are not entitled to summary judgment on Counts VI and VII based on the legal contentions raised in this appeal.

*Godfrey II*, 898 N.W.2d at 880; *see also Wagner v. State*, 952 N.W.2d 843, 851 (Iowa 2020) (describing this limitation in *Godfrey II*'s holding).

The doctrine of judicial estoppel similarly has no application here. Judicial estoppel forbids a party who has "successfully and unequivocally asserted a position in one proceeding from asserting an inconsistent position in a subsequent proceeding." *Vennerberg Farms, Inc. v. IGF Ins.*, 405 N.W.2d 810, 814 (Iowa 1987). The defendants in *Godfrey II* made no

concession that Godfrey was entitled to a remedy under the ICRA. Rather, the State simply argued that the ICRA provides an exclusive remedy for the *type of conduct* that Godfrey alleged and thus that the ICRA preempts the constitutional claim that Godfrey asked us to recognize. The line that the majority quotes from the defendants' *Godfrey II* brief states as much: "[I]t is well settled that Chapter 216 provides the *exclusive* remedy *for conduct prohibited by* the Iowa Civil Rights Act ('ICRA')." That statement isn't controversial; our court has made similar statements, repeatedly. *See Smidt v. Porter*, 695 N.W.2d 9, 17 (Iowa 2005) ("The ICRA preempts a claim when, 'in light of the pleadings, discrimination is made an element of' the claim." (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 858 (Iowa 2001))). A defendant may argue that a statute preempts a different cause of action without conceding that the statute in fact provides relief to the particular plaintiff. Nothing in the defendants' argument in *Godfrey II* takes an inconsistent position from the one taken in this appeal. Godfrey, for his part, doesn't even argue the doctrine applies; reference to "judicial estoppel" appears nowhere in his appeal brief.

Iowa law as applied to the evidence submitted in this case conclusively establishes that the workers' compensation commissioner is a public officer and not an "employee." As a matter of law, Godfrey's claims under the Iowa Civil Rights Act, which apply to "employees" but not to public officers, thus must fail as a matter of law. As a result, I would hold that the district court erred in failing to grant the defendants' motions for directed verdict and judgment notwithstanding the verdict on Godfrey's ICRA claims.

Christensen, C.J., joins this concurrence in part and dissent in part.